

**NUMBER 13-17-00579-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ALEJANDRO SALAZAR III,                                          Appellant,

v.

THE STATE OF TEXAS,                                             Appellee.

**On appeal from the 329th District Court of
Wharton County, Texas.**

# OPINION

**Before Justices Contreras, Longoria, and Hinojosa
Opinion by Justice Hinojosa**

Appellant Alejandro Salazar III appeals from a judgment convicting him of one first-degree felony count of aggravated sexual assault of a child, sentencing him to fifteen years' confinement, and assessing a $5,000 fine.  *See* TEX. PENAL CODE ANN. § 22.021 (West, Westlaw through 2017 1st C.S.).  In one issue, Salazar challenges the legal

sufficiency of the evidence supporting his conviction.  We reverse and remand to the trial court to reform the judgment and to conduct a new punishment hearing.

## I. BACKGROUND

The live indictment in this case alleges that Salazar, on or about October 23, 2015, in Victoria County, Texas:

> did then and there intentionally and knowingly cause the sexual organ of C.[O.[1]], a child who was then and there younger than 17 years of age, to penetration [sic] of the mouth of the said defendant, Alejandro Salazar, without the consent of C.[O.], and the defendant did then and there by acts or words threaten to cause, or place, C.[O.] in fear that serious bodily injury would be imminently inflicted on C.[O.], and said acts or words occurred in the presence of C.[O.]

The witnesses the jury heard from may be broadly categorized as C.O., counselors, and C.O.'s family members.

### A.     C.O.'s Testimony

C.O. recalled the living arrangements at his home, the October 23, 2015 incident with Salazar, and how it affected him.  In September 2015, C.O., who was fourteen years old at the time, started living with his father, stepmother, two adult stepbrothers, and an adult stepsister in a two-bedroom house.  C.O.'s father and stepmother occupied one bedroom, his stepsister Niki Salazar and his stepbrother Zach Salazar shared a bedroom, and C.O. and his other stepbrother Salazar slept on separate couches in the living room.

On the evening of Friday, October 23, 2015, C.O.'s father and stepmother left the home to eat dinner at a restaurant in a nearby town, C.O. stayed at the home with Salazar,

---

[1] We use C.O. as an alias to protect the minor's identity.  *See* TEX. R. APP. P. 9.8 cmt. (West, Westlaw through 2017 1st C.S.) ("The rule does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances in other cases.").

and Niki and Zach were not at the home. After C.O.'s father and stepmother left for dinner, he fell asleep on the couch. In response to the State's questions, C.O. testified:

Q.    . . . How did the incident start? What happed first?

A.    I was left—I was left at home, and I fell asleep and it was like—I heard somebody came in and it was him, so I just—I was still—I fell back to sleep, and then for a little bit, I like—then the next thing I woke up because I felt somebody was touching me and it was him.

Q.    Let me stop you there. Where was he touching you?

A.    On my—like, my penis.

Q.    Okay. And did you have clothes on?

A.    Yes, ma'am.

Q.    Okay. And what was he touching you with?

A.    His hand.

Q.    Okay. And then what happened?

A.    And I told him, "What are you doing?" And then he—then he said, "Just let me do this."

       And I said, "What are you doing?"

       And he told me that, "Just let me do it."

       I said, "No, it doesn't seem right." I said, "I don't like this."

       He just told me to let him do this. And then after that, he told me to get up. Then he told me that I should let him do this.

       And he started to tell me how he will hurt me and, like, his dad, like, hurt people and he got scared. And after that, like, he told me I should let him do this before he hurt me.

       I was like—like, I was scared. I didn't know. So he said let him do this before he does something. So he put his mouth on my bottom— on my penis, and I let him do that to me.

       . . .

3

Q. Okay. Why do you feel like you did something wrong?

A. Because if I didn't—I feel like if I didn't let him do that, that he would probably hurt me.

. . .

Q. During the time that this was happening, and we know that you've described where his mouth was, will you please tell us where his hands were?

A. On my thighs.

. . .

Q. How did it finally end? Why did it finally stop?

A. I don't know.

Q. Okay.

A. He just stopped on his own.

After the incident, Salazar went outside, and C.O. went into his father and stepmother's bedroom, locked the door, and cried.

C.O. did not immediately tell anyone, including his father and stepmother upon their return to the home, about the incident. Even though he did not immediately mention the incident, C.O. testified that it affected him. He began having trouble sleeping and bad dreams about "[l]ike having that feeling again, having him touch me again or hurting me." In January 2016, C.O. told his father and stepmother about the incident he had with Salazar. Neither acknowledged the incident, and C.O. feels that his father did—and does—not believe him.

**B. Counselors' and Police Officer's Testimony**

In March 2016, C.O. presented to his high school principal's office wanting to speak to someone. The principal's secretary referred him to Carla Baker, the school's at-risk counselor. C.O. told Baker about his October 23, 2015 encounter with Salazar. According to Baker, C.O. was "very—. . . upset," "in tears," and "frighten[ed]". In accordance with school district protocol, Baker then called Child Protective Services, the El Campo Police Department, the principal, and C.O.'s mother. C.O.'s mother reported to Baker that he "was having troubles, nightmares and stuff." Baker elaborated on her concern for C.O. and her provision of in-school counseling services to him, stating:

> Children—in this situation, you don't find a young man, especially a freshman in high school who wants to be labeled or bullied and bullying is what he actually, you know, was describing, except after he went to the other part, the touching and stuff.

> But the bullying is the part that really, really bothered me, and [C.O.] was so afraid of, you know, going anywhere. He got so he couldn't even stay in class, and teachers were instructed that whenever [C.O.] became like this, to send him to me immediately and that continued for a while.

> And then it got so he could walk down and just—sometimes he'd just walk down to my office with a note from the teacher and I'd say, "[C.O.], are you . . ."

> And he'd say, "I just needed a break," and he would do that and that was okay.

The investigatory process led to C.O. being referred to Marty Harris, a licensed professional counselor. Harris provided regular counseling to C.O. for a year. According to a mental health assessment performed by Harris, C.O. had anger outbursts, irritability, flashbacks, bad dreams, and intrusive thoughts that affected his daily functioning. C.O. also had some symptoms of depression, such as poor appetite and insomnia. C.O.'s intrusive thoughts and flashbacks were of the sexual abuse. Harris diagnosed C.O. as having post-traumatic stress disorder (PTSD). During Harris's counseling sessions, C.O.

5

recounted that he was "being threatened in the kitchen by his stepbrother, Alex . . . ." At the time of trial, Harris believed that C.O.'s PTSD "triggers" were from "fear of the alleged perpetrator and perhaps his mother."

## C. Niki's and Salazar's Testimony

Niki recalled an altercation she had with Salazar wherein there was "shoving, pushing, maybe trying to punch but not a slap or anything" that led to police intervention.

Salazar denied C.O.'s allegations. He opined that C.O. made up the alleged encounter because C.O.'s father and stepmother were placing more rules on C.O. and C.O. wanted to return to his mother's home. On cross-examination by the State, Salazar admitted to previously pleading guilty to one count of driving while intoxicated, one count of possession of a controlled substance, and one count of attempted forgery, each count occurring at different times since Salazar turned eighteen years old. Salazar also admitted to an altercation with his grandfather and the altercation with Niki.

## D. The Jury's Verdict and the Judgment

The jury charge defined, among other things, "serious bodily injury," and it instructed the jury on aggravated sexual assault. It also instructed the jury on the lesser-included offense of sexual assault of a child. During its deliberations, the jury asked in a written note, "What age makes for automatic aggravated?" The trial court's written response was, "You have all the evidence and all of my instruction. Please continue your deliberations." The jury found Salazar guilty of aggravated sexual assault of a child, a first-degree felony, and it later assessed punishment at fifteen years' confinement and a $5,000 fine. The trial court signed a judgment in accordance with the jury's verdict. This appeal followed.

6

## II. DISCUSSION

Salazar's sole issue is that the evidence is legally insufficient to support the aggravation element for the offense of aggravated sexual assault.

### A. Standard of Review

When examining the legal sufficiency of the evidence, we consider the combined and cumulative force of all admitted evidence in the light most favorable to the conviction to determine whether, based on the evidence and reasonable inferences therefrom, any rational trier of fact could have found each element of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). In doing so, we give deference to the responsibility of the jury as factfinder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from facts. *Johnson v. State*, 419 S.W.3d 665, 671 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd).

We measure the legal sufficiency of the evidence against the elements of the offense as defined by a hypothetically correct jury charge for the case. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (internal quotation marks omitted). The law as authorized by the indictment must be the statutory elements of the offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). That is to say, the hypothetically correct jury charge could not

7

simply quote the language of the statute; rather, it must track the elements of the law specifically alleged by the indictment. *Id.* at 404–05.

**B.    Applicable Law**

The hypothetically correct jury charge in this case would provide that a person commits the offense of aggravated sexual assault of a child if the person causes the sexual organ of a child to contact or penetrate the mouth of the actor and by acts or words places the victim in fear that death or serious bodily injury will be imminently inflicted on any person. TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(iii), (a)(2)(A)(ii). "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. *Id.* § 1.07(a)(46) (West, Westlaw through 2017 1st C.S.).

In the context of an aggravated sexual assault, the complainant's state of fear is normally established through his or her own testimony. *Brown v. State*, 960 S.W.2d 265, 268 (Tex. App.—Corpus Christi 1997, no pet.). The defendant's conduct is then examined to determine whether it was the producing cause of such fear and whether the subjective state of fear was reasonable in light of such conduct. *Id.* (citing *Perryman v. State*, 798 S.W.2d 326, 332 (Tex. App.—Dallas 1990, no pet.); *Foreman v. State*, 743 S.W.2d 731, 732 (Tex. App.—El Paso 1987, no pet.)). Where the objective facts of the assault would naturally cause the victim to fear for life or serious bodily injury—as where a deadly weapon, explicit threats, or excessive force or violence are used—it is reasonable to assume that the victim had the requisite level of fear in the absence of some specific evidence to the contrary. *See Brown*, 960 S.W.2d at 268 (citing *Carter v.*

8

*State*, 713 S.W.2d 442, 445 (Tex. App.—Fort Worth 1986, pet. ref'd) (the victim was gagged, tied up, and thrown to the floor in the course of the sexual assault)).

We note that in cases where a defendant is accused of threatening or conveying bodily—though not serious bodily—injury, the defendant is indicted on a count of sexual assault of a child rather than aggravated sexual assault of a child. *See, e.g., Marcum v. State*, No. 05-07-01409-CR, 2008 WL 4182822, at *1 (Tex. App.—Dallas Sep. 12, 2008, no pet.) (op., not designated for publication) (complainant, a fourteen year-old girl, testified that she had sex with twenty-seven year-old defendant because she was "scared what would happen" if she resisted, so she "went ahead and did it so [she] wouldn't get hurt or nothing like that"); *Martinez v. State*, No. 10-04-00072-CR, 2005 WL 851115, at *1 (Tex. App.—Waco Apr. 13, 2005, pet ref'd) (mem. op., not designated for publication) (complainant testified that defendant put his hand over her mouth, pushed her onto her back, and warned her that he would hurt her if she said anything).

## C.    Analysis

Salazar argues that the evidence is legally insufficient to support the aggravating element that his "acts or words" placed C.O. "in fear that death, serious bodily injury, or kidnapping will be imminently inflicted on any person."   TEX. PENAL CODE ANN. § 22.021(a)(2)(A)(ii). In response, the State points to C.O.'s testimony regarding his "fear" and being "scared;" his recollection of Salazar's statements regarding how Salazar's father used to hurt him and how Salazar could do the same to others; Salazar's history of police intervention following domestic violence incidents; Salazar's drug and alcohol abuse; and C.O.'s diagnosis of PTSD and subsequent treatment.  As legal authority, the State references *Ontiveros v. State*, 890 S.W.2d 919, 927 (Tex. App.—El Paso 1994, no

9

writ), for the proposition that "[t]he jury may consider the actor's objective conduct, his acts, words, or deeds and then infer from the totality of the circumstances whether or not his overall conduct placed the complainant in fear of serious bodily injury."

In *Ontiveros*, the appellant argued that one of two co-defendants placed the complainant in fear that serious bodily injury or death would be imminently inflicted on the complainant and that there was legally insufficient evidence that the appellant himself did so. In rejecting the appellant's argument, the Eighth Court of Appeals wrote that:

> the evidence at trial revealed that the fifteen year old victim was parked in her two-door car having sexual intercourse with her boyfriend, Robert Rosales when she was accosted by the appellant and the two co-defendants. The appellant and co-defendant Andasola attacked the boyfriend, beat him unconscious, and threw the victim into the back seat of the car. Co-defendant Diaz got in with the victim. The Appellant drove the car. Andasola was in front with the unconscious boyfriend.
>
> Diaz hit the victim with his fist and bit her on the lip and breast. Andasola told Diaz to hold the victim and the Appellant stopped the car. Andasola threw the unconscious boyfriend out of the car and Appellant drove off. He then stopped the car again and the three discussed who would first sexually assault the victim. Andasola got in back and told the victim to lie down and he raped her. The victim complied because she did not want to be hurt and she knew she could not resist. Then the Appellant told the victim to lie down and she complied due to her fears. She was again raped.
>
> Diaz tried to rape the victim but was unsuccessful. They drove off and got some gasoline and after another unsuccessful attempt on Diaz's part to have intercourse, they drove into Mexico and released the victim. Upon her return to the United States, she reported the incident, which lasted about four hours, to the police.
>
> During the course of this incident, the Appellant told Diaz not to hit the complainant. Andasola told the victim that she was lucky that Appellant was present or she would have been hurt more.
>
> The police officer who saw the victim right after she reported the incident stated that she was in shock and photos of her were admitted into evidence showing bruises and bleeding from her lip and breast.

> In his written confession, Appellant admitted to sexually assaulting the victim and the attack on her boyfriend.

*Id.* 927–28 (footnote omitted).[2] The attack on Rosales and the fact that it rendered him unconscious was an objective fact that was sufficient to show that the complainant's subjective fear was reasonable. *Id.*; *see also Brown*, 960 S.W.2d at 268.

The record in this case is distinguishable from that of *Ontiveros*. Salazar's acts or words do not approach those of the appellant in *Ontiveros*. Moreover, neither party points us to any part of the record detailing how Salazar's father "hurt people" so as to assess whether such a statement could support the reasonableness of C.O.'s fear. Similarly, there is no indication that C.O. was aware of Salazar's two previous domestic violence disturbances that resulted in police intervention or that Salazar abused alcohol and drugs. Even if we assumed that C.O., who began sharing a home with Salazar the month before the incident allegedly occurred, knew of Salazar's two previous domestic violence disturbances, his abuse of alcohol and drugs, and his father's unspecified "hurting" of people, the statute requires some evidence of acts or words on Salazar's part that were the producing cause of C.O.'s fear of imminent serious bodily injury and we must determine whether such fear was reasonable in light of Salazar's act or words. *See* TEX. PENAL CODE ANN. § 22.021(a)(2)(A)(ii); *Brown*, 960 S.W.2d at 268.

The opinions overruling similar legal sufficiency challenges in aggravated sexual assault cases where the assailant's violent tendency is unknown to the complainant point to a specific act of violence directed at the complainant. *See Lewis v. State*, 984 S.W.2d

---

[2] The abstract portion of the jury charge included the law of parties. *Ontiveros v. State*, 890 S.W.2d 919, 926 (Tex. App.—El Paso 1994, no writ). However, because the law of parties was not included in the application paragraph, the appellate court determined only whether the evidence was sufficient to find the appellant guilty of aggravated rape by his own conduct. *Id.*

732, 733 (Tex. App.—Fort Worth 1998, pet. ref'd) (the appellant kicked into the apartment's door, splintering the frame); *Kowey v. State*, 751 S.W.2d 587, 589 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd) (the appellant suddenly slammed the complainant into the wall, held her against the wall with his body, demanded money while twisting complainant's right arm, and placed his hand over her mouth); *see also Wise v. State*, No. 05-08-01199-CR, 2009 WL 2648389, at *7 (Tex. App.—Dallas Aug. 28, 2009, no pet.) (op., not designated for publication) (the appellant put his arm around the complainant's neck and forced her onto her bed, dragged complainant backwards with his arm around her neck, choked complainant, forced her to her hands and knees, and was "rough and forceful"); *Bell v. State*, No. 05-94-00070-CR, 1999 WL 167612, at *2 (Tex. App.—Dallas Mar. 29, 1999, no pet.) (op., not designated for publication) (the appellant told the complainant that he was going to kill her before he left the house and terrorized her to the extent she thought she was going to die); *Holzworth v. State*, No. 14-96-00091-CR, 1998 WL 418762, at *1 (Tex. App.—Houston [14 Dist.] Jul. 23, 1998, pet. ref'd) (op., not designated for publication) (the appellant and a co-defendant told complainant "it" would be worse if she did not behave, appellant held her hands down while co-defendant sexually assaulted her, and appellant began hitting complainant after she bit him).

Such conduct is missing here. Indeed, C.O. never testified that he feared imminent serious bodily injury. Salazar's "history" coupled with his words regarding "hurting" C.O. and his hands on C.O.'s thighs are not the type of acts or words that would support fear of an imminent bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any

12

bodily member or organ.  *See id.*; *see also* TEX. PENAL CODE ANN. § 1.07(a)(46).  Instead, Salazar's statements, as recounted by C.O., may support a finding of fear of potential bodily—though not serious bodily—injury.  *See, e.g., Marcum v. State*, 2008 WL 4182822, at *1; *Martinez*, 2005 WL 851115, at *1.  Further, there is no indication the PTSD Harris diagnosed C.O. as having originated in C.O.'s fear of serious bodily injury rather than the sexual assault itself.

Salazar's first issue is sustained.

**D.    Modification**

When the evidence does not support a conviction for a greater offense, we modify the trial court's judgment to reflect a conviction for a lesser included offense if the evidence supports it.  *See Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014).  Sexual assault is a lesser included offense of aggravated sexual assault.  *McGahey v. State*, 744 S.W.2d 695, 696 (Tex. App.—Fort Worth 1988, writ ref'd).  Having determined that the evidence does not support a conclusion that Salazar's acts or words placed C.O. in fear of imminent serious bodily injury, we now consider whether a rational jury could have found Salazar guilty of the lesser included offense of sexual assault of a child by intentionally or knowingly causing the sexual organ of C.O., a child as defined by the statute, to contact or penetrate the mouth of another person, including Salazar.  *See* TEX. PENAL CODE ANN. § 22.011(a)(2)(C) (West, Westlaw through 2017 1st C.S.).

C.O.'s testimony of his encounter with Salazar on October 23, 2015, meets all of the elements of section 22.011(a)(2)(C).  We conclude that the evidence is legally sufficient to convict Salazar of the second-degree felony of sexual assault of a child.  *See id.*; *Jackson*, 443 U.S. at 307.

13

### III. CONCLUSION

We reverse the trial court's judgment. We remand the case to the trial court to reform the judgment to reflect a conviction for sexual assault of a child, a second-degree felony, *see* TEX. PENAL CODE ANN. § 22.011(a)(2)(C), and to conduct a new punishment hearing. *See Thornton*, 425 S.W.3d at 300.

LETICIA HINOJOSA
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
2nd day of August, 2018.