

# NUMBER 13-18-00070-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **VALENTINE SANTOS RAMOS,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

### On appeal from the 25th District Court
### of Gonzales County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Hinojosa and Tijerina**
**Memorandum Opinion by Justice Hinojosa**

A jury convicted appellant Valentine Santos Ramos of one count of aggravated sexual assault of a child, a first-degree felony, and four counts of sexual assault of a child, a second-degree felony.   *See* TEX. PENAL CODE ANN. §§ 22.021, 22.011.   The jury found an enhancement paragraph true, and Ramos was sentenced to life without parole in the Texas Department of Criminal Justice—Institutional Division for both offenses, with the

sentences to run consecutively.

In this appeal, Ramos challenges the legal sufficiency of the evidence showing that the complainant was under the age of fourteen at the time the offenses occurred. He agrees, though, that the evidence proves that the complainant was a child younger than seventeen, thus making his life sentences parole-eligible. *See* TEX. PENAL CODE ANN. § 12.42(c)(2)(A)(i), (c)(4)(A). We affirm the judgment as modified.

## I. BACKGROUND

The State charged Ramos in a 119-count indictment, alleging various offenses of sexual misconduct against his ex-girlfriend's daughter, T.S.[1], such as continuous sexual abuse of a young child, aggravated sexual assault of a child, indecency with a child by sexual contact, and sexual assault of a child. The indictment also included an enhancement paragraph stating that Ramos had previously been convicted of aggravated sexual assault of a child. *See id*. § 12.42(c)(4)(A).

T.S. testified that Ramos began dating her mother B.W. when she was "about 12 or 13." T.S. recalled that Ramos was initially very nice to her. She "saw him as a father figure because [her] father hadn't been in [her] life." T.S. stated that Ramos added financial security to her family life by helping her mother pay household bills like rent, electricity, and water, and buying T.S. new school clothes. He also opened a checking and savings account for T.S. at a local bank. T.S. testified that every time Ramos got paid, he would put $50 into each account so that T.S. could purchase new clothes or buy

---

[1] We use initials to protect the identity of complainants in sexual assault cases. *See Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.).

2

games for her PlayStation.

At a certain point, however, T.S. claimed that Ramos started to treat her differently. For example, Ramos wanted her to hold his hand and stay by his side when shopping, which embarrassed T.S. because she "was old enough to be able to walk around by [herself]" at twelve or thirteen. Eventually, she shared that his hand moved from her hand to her waist during shopping trips. Ramos did not allow T.S. to be around boys. If T.S. ever spoke to a boy, Ramos would "get very, very upset and angry." He also imposed a strict dress code for T.S., not allowing her to wear shorts "because they were too easy access from the top" and only permitting blue jeans because "they'd be too hard to get them off."

T.S. testified about the first time Ramos made her "pretty uncomfortable." T.S. recalled that she was in the living room watching a movie when Ramos came to sit next to her wearing only his boxer shorts. According to T.S., around that time Ramos began to act more "like a boyfriend" when her mother was not around, as opposed to a parental figure. He sometimes tried to kiss her, which T.S. did not like. He also gave her jewelry, including a bridal set ring.

T.S. recalled the first time Ramos sexually assaulted her. She was on her bed wearing a nightgown when Ramos came in wearing purple shorts. Ramos initially just started tickling her, which T.S. interpreted as Ramos being nice. Then, however, Ramos's hands started moving over her body. He somehow removed both her clothes and his. She testified that she was in shock and "didn't know what to think because [she] didn't realize what was going on." According to T.S., Ramos moved from the foot of her

3

bed onto her bed and placed his legs in between hers, which were spread apart. He then penetrated her vagina with his penis. T.S. testified that Ramos "was going back and forth with [his penis], in and out actually, and he was—he wasn't being gentle. It was rough." She "wanted to scream but [she] was crying." When Ramos was done, T.S. went to the restroom and noticed she was bleeding. She felt like she "had popped and it was just real painful." She soaked in a tub of warm water to help with her vaginal pain and swelling.

The sexual assaults continued almost daily, as Ramos was the adult who tucked her into bed at night. T.S. testified that he would spend "40 minutes, up to an hour sometimes" in her room every night. T.S. testified that she "wished [she] would have wrote everything down" and admitted that her ages when these assaults occurred were hard to remember.

B.W., T.S.'s mother, testified that she started dating Ramos when T.S. was twelve years old. She stated that although T.S. told her about the sexual abuse when she was thirteen, B.W. refused to believe it. When B.W. confronted Ramos, he told her "he would never hurt [her] daughter because he said that she was like his daughter." Because B.W. believed him, she allowed him to continue living with her and T.S. B.W. testified that she had a lot of regrets about the way she handled the situation.

Noella Hill, a registered nurse and Sexual Assault Nurse Examiner (SANE), also testified at trial. Hill stated that she first examined T.S. on June 10, 2013, when T.S. was thirteen. T.S. was sent for an exam because a classmate had assaulted her on May 22 or 23, 2013, allegedly penetrating her vagina with his finger and also touching her breast.

4

During Hill's medical examination, though, she found injuries that were inconsistent with what T.S. told her. Hill found a tear in T.S.'s vestibule, which was more consistent with penile penetration than digital penetration. Further, when Hill was taking T.S.'s history, T.S. brought up the name "Val," which was Ramos's nickname. T.S. told Hill "that [Ramos] was a good dad" and "he never messed with her." Hill thought this was odd because Hill never asked her a question about him—T.S. brought up Ramos's name on her own. Hill also said that T.S. placed a teddy bear in front of her face while talking about Val, then exited the room quickly saying that she needed a drink.

T.S. testified that Ramos was already having sex with her before the very first time she saw Hill. T.S. was born on June 25, 1999. This means she was thirteen when Hill first examined her on June 10, 2013.

The State only proceeded on five counts.[2] Count One was aggravated sexual assault of a child. *See id*. § 22.021. Counts Two through Five alleged sexual assault of a child. *See id*. § 22.011. The jury found Ramos guilty on all counts and sentenced him to two life sentences without parole. *See id.* § 12.42(c)(2)(A)(i), (c)(4)(A). Ramos subsequently filed this appeal.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

When examining the legal sufficiency of the evidence, we consider the combined and cumulative force of all admitted evidence in the light most favorable to the conviction to determine whether, based on the evidence and reasonable inferences therefrom, any rational trier of fact could have found each element of the offense beyond a reasonable

---

[2] The State proceeded on Counts 2, 4, 52, 94, and 110, which the parties agreed to re-number as Counts 1 through 5 for the jury charge.

5

doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Ramsey v. State*, 473 S.W.3d 805, 808 (Tex. Crim. App. 2015). In doing so, we give deference to the jury as factfinder to fairly resolve conflicts in testimony, weigh evidence, and draw reasonable inferences from facts. *Salazar v. State*, 562 S.W.3d 61, 65 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We measure the legal sufficiency of the evidence against the elements of the offense as defined by a hypothetically correct jury charge for the case. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011); *Salazar*, 562 S.W.3d at 65. Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246; *Salazar*, 562 S.W.3d at 65.

Here, the elements for aggravated sexual assault of a child are: (1) a person (2) intentionally or knowingly (3) causes the sexual organ of a child who was then and there younger than fourteen years of age (4) to contact the sexual organ of the defendant. *See* TEX. PENAL CODE ANN. § 22.021. The elements of sexual assault of a child are: (1) a person (2) intentionally or knowingly (3) causes the sexual organ of a child who was then and there younger than seventeen years of age (4) to contact the sexual organ of the defendant. *See id*. § 22.011.

6

## III. ANALYSIS

### A. Count One: Aggravated Sexual Assault of a Child

By his first issue, Ramos challenges the legal sufficiency of the evidence showing that T.S. was under the age of fourteen at the time the offense alleged in Count One occurred. Count One referred to Ramos's very first assault of T.S., when Ramos penetrated T.S.'s vagina with his penis on her bed and she sat in a tub of water afterwards.

Ramos contends that the evidence proves that T.S. was a child younger than seventeen years old, but not younger than fourteen. Here, T.S. testified that she believed Ramos was having sex with her before her first SANE examination with Hill. T.S. was born on June 15, 1999, meaning that she was thirteen at the time of her first SANE examination on June 10, 2013. She turned fourteen on June 25, 2013. In addition, Hill's testimony revealed that she saw evidence of penile penetration. Hill did not believe that digital penetration could cause the tear in T.S.'s vaginal vestibule, like T.S. claimed. Further, the jury heard B.W. testify that T.S. was thirteen when T.S. told her Ramos was sexually abusing her. From this evidence, a rational juror could have found beyond a reasonable doubt that T.S. was under fourteen at the time of the first assault.

T.S. testified that she "wished [she] would have wrote everything down." She also admitted under oath that her ages when these assaults occurred were hard to remember and she had trouble recalling dates and timelines. In a sufficiency review, however, we defer to the factfinder's weighing of the evidence. *Clayton*, 235 S.W.3d at 778. The jury

7

found that T.S. was under the age of fourteen at the time of the first assault, and our standard of review requires us to defer to this finding of fact. We overrule Ramos's first issue.

## B. Counts Two Through Five: Sexual Assault of a Child

By his second issue, Ramos contends T.S. was over the age of fourteen at the time Counts Two through Five occurred. In its brief, the State concedes the second issue, setting forth that "the judgments for Counts II through V should be reformed because the trial court made no finding that T.S. was under the age of fourteen." Accordingly, we modify the judgment on Counts Two, Three, Four, and Five to reflect a "life" sentence, not "life without parole." *See* TEX. PENAL CODE ANN. § 12.42(c)(4)(A); TEX. R. APP. P. 43.2(b) ("The court of appeals may . . . modify the trial court's judgment and affirm it as modified.").

## IV. CONCLUSION

We modify the judgment on Counts Two through Five to reflect a sentence of "life" rather than "life without parole." We affirm the trial court's judgment as modified.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
26th day of November, 2019.