

# NUMBER 13-20-00039-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

CLYDE ALEXIS VANTERPOOL,                                    Appellant,

v.

THE STATE OF TEXAS,                                          Appellee.

## On appeal from the 54th District Court
## of McLennan County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Contreras and Justices Benavides and Silva
### Memorandum Opinion by Justice Benavides

By four issues, appellant Clyde Alexis Vanterpool appeals his conviction for two counts of trafficking of persons, a first-degree felony. *See* TEX. PENAL CODE ANN. § 20A.02. Vanterpool alleges the trial court erred by: (1) denying his motion for mistrial; (2) overruling his objection to the State's closing argument in punishment; (3) overruling his objection to an additional jury instruction during deliberation; and (4) finding that the

State's notice regarding a punishment witness was reasonable. We affirm.

## I.    BACKGROUND[1]

In October 2016, Vanterpool was indicted for two counts of trafficking of persons and two counts of sexual assault of a child relating to the complaining witnesses in this case, L.G. and R.H.[2] *See id.* §§ 20A.02, 22.011. Both complainants were under the age of seventeen at the time the offenses were alleged to have occurred. Prior to trial, the State abandoned the sexual assault counts.

### A.    Case in Chief

At trial in December 2019, the jury heard evidence regarding the outcry statements of L.G. and R.H. Both complainants testified that, at the time of the offense, they were residing at the Waco Center for Youth (the Center), a center for mental and behavioral issues. L.G. testified that on December 9, 2015, when he was fifteen years old, he and R.H. had run away from the Center and spent the night in Cameron Park in Waco. They convinced a couple they were traveling and needed money, so the couple gave them twenty dollars for food. L.G. stated that Vanterpool approached them the following morning while they were sitting at a park bench and started a conversation. L.G. asked Vanterpool if he could find them marijuana, and Vanterpool said he could, so the boys left the park in Vanterpool's vehicle. L.G. explained that Vanterpool took them across Waco to his home, there were bars on the doors and windows, and the home had a locked gate.

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

[2] We use initials to protect the identities of the complainants. *See* TEX. R. APP. P. 9.8 cmt.; *Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.).

2

L.G. and R.H. went inside and Vanterpool started pouring them drinks mixed with whiskey. L.G. believed he had "a lot" of whiskey and noticed Vanterpool was not drinking much. L.G. said they went into the living room and Vanterpool played a pornographic video. At this point, L.G. began to feel sick and went into the bathroom. Vanterpool eventually came in the bathroom to "check on" L.G. and pulled down L.G.'s pants and put his mouth on L.G.'s penis. L.G. explained that he pushed Vanterpool off, and Vanterpool then became "agitated" and left the bathroom. L.G. eventually made it back to the living room, but said he was too "drunk" to look for R.H. and took a "dagger" off the wall and hid it under the couch for protection.[3] R.H. then appeared and told L.G. that Vanterpool had forced R.H. to have sex with him. L.G. testified that the boys were at Vanterpool's home from around 8 a.m. until 2 p.m. when L.G. convinced Vanterpool to take them back to the park. L.G. eventually returned to the Center without R.H. and asked personnel to find R.H. because R.H. had threatened to hurt himself.

R.H. testified that he was sixteen years old in December 2019. He agreed that L.G. and he had run away from the Center and lied about their age to the couple who gave them money. R.H. said the boys were sitting at a bench in the park on December 10 when Vanterpool approached them and asked if they wanted to go to his house to drink and smoke. R.H. noticed Vanterpool's house looked different than his neighbors' based on the bars and gates. R.H. stated he had between five and six glasses of whiskey and got "very drunk" and "disoriented." He remembered L.G. going into the bathroom and hearing him throw up. L.G. came out of the bathroom and told R.H. what Vanterpool had done.

---

[3] Both complainants described Vanterpool's home as having daggers and swords displayed on the wall.

R.H. explained,

> So I know it's going to take place there. I offer myself to [Vanterpool] because I know exactly what's going to happen here. I don't want it to escalate. I don't really like proceeding to violence. No one wants to deal with that. So [Vanterpool] proceeds to give me oral sex, perform oral sex on me."

> . . . .

> [Vanterpool] takes me into the back room, gives me a condom. I put that on and proceed to perform anal sex on him.

R.H. also said he took a "dagger" off the wall and hid it in his sock in case things "escalated." Once the boys got back to the park and they went their separate ways, R.H. said he considered "jumping off the cliffs" in the park and it had been a "bad day." He later saw a campus police officer and asked for help. R.H. also told the jury that he did not think they could leave without one of the boys having sex with Vanterpool, and he was not willing to fight Vanterpool.

Multiple law enforcement officers also testified about the investigation. The initial responding officer stated that L.G. had told her that there were plaques in the house that said "Clyde something pool" and described the vehicle they left the park in. The officer who spoke to R.H. said he was "shaken up," "nervous," and "excitable," and he had a dagger and was threating his own life. R.H. also later told her that Vanterpool asked for anal sex, gave R.H. oral sex, and stated he went along with it because he was "afraid for his life."

The complainants later gave statements regarding the incident, drew detailed diagrams of the home, and identified Vanterpool from a photo lineup. Items of clothing of both boys were collected during a sexual assault exam and sent for DNA testing.

4

Vanterpool's DNA was found on both of the boys.

Kim Clark with the Waco Police Department was the lead detective on the case. Detective Clark was present when a search warrant was executed on Vanterpool's home and testified that the dagger L.G. said he hid was in the exact place L.G. stated he hid it. Vanterpool came to the Waco Police Department to give a statement, but Detective Clark explained he was not under arrest and he was free to leave at any time. Vanterpool initially told Detective Clark that the boys approached him in the park and told him they were eighteen years old. He said they asked Vanterpool for a ride across town, but Vanterpool told the boys he would only take them as far as he was going. Vanterpool stated he was going to the local tax office when he stopped at the park, but he was missing the documents he needed, so he went home to look for them. Vanterpool told Detective Clark that he dropped the boys off a few doors down from his house, but fifteen minutes later, R.H. rang his doorbell and asked to use the bathroom. After letting R.H. in, Vanterpool said he noticed L.G. in the home later and saw R.H. wiping his hands on a sweaty t-shirt Vanterpool had taken off. As the interview progressed, Vanterpool stated he had four to five whiskeys, that the boys were there from around 8:30 a.m. until the afternoon, and he could not remember if anything had occurred between himself and the complainants.

Vanterpool testified during trial that the boys approached him in the park and said they were eighteen years old and "traveling." He said he did not entice them with alcohol and cigarettes and did not give them whiskey at his home. Vanterpool stated that he did not see L.G. throw up in the house, was not aware they took anything from his house, and no sexual acts were performed. Vanterpool explained the boys were at his home for

5

about fifteen minutes in the morning, left, came back around 1:15 p.m. for thirty minutes, and then he took them back to the park.

After Vanterpool testified, the State brought Detective Clark back as a rebuttal witness. The interview video was played for the jury wherein Vanterpool stated the boys were in his house for five to six hours. During the video, Detective Clark referred to a polygraph examination being possible. When Vanterpool objected to the reference, the trial court sustained his objection, told the jury to disregard any reference to the polygraph, and denied Vanterpool's motion for mistrial.

## B.    Jury Deliberations

After the case was sent to the jury for deliberations, the jury announced it had reached a verdict. However, when the trial court looked at the verdict form, it found that the jury had found Vanterpool guilty of both trafficking of persons counts and the lesser included counts of sexual assault of a child. *See id.* The trial court instructed the jury to return to its deliberations and select only one of the charges. After the jury retired again, Vanterpool objected to the trial court's instruction. The jury returned with a unanimous verdict of guilty of trafficking of persons. *See id.* § 20A.02.

## C.    Punishment Evidence

Prior to the start of the punishment phase of the trial, the parties approached the trial court and explained that a witness, J.B.,[4] had come forward the day before and stated that Vanterpool had assaulted him as well. The State explained that it gave

---

[4] J.B. testified that Vanterpool was his commanding officer in the United States Army. J.B. and Vanterpool were celebrating J.B. receiving his disability benefits after being discharged from the Army due to medical reasons.

6

Vanterpool notice as soon as it was aware of the witness, furnished him with a copy of the interview conducted by the State's investigator, and that article 37.07 of the code of criminal procedure controlled this situation. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07. Vanterpool argued that it was not reasonable notice. The trial court overruled Vanterpool's objection and found the notice reasonable. At the punishment phase, J.B. was allowed to testify as to an encounter with Vanterpool in 2011 where Vanterpool was drinking and tried to grab his crotch area multiple times.

## D.     Punishment Argument

During closing arguments in the punishment phase of trial, Vanterpool made references to the complainants being runaways and how they repeatedly lied to people regarding their age so they would not be reported to the police.

In the State's rebuttal closing, the following occurred:

| State: | We don't know where these kids would have been. I hate that he—that the defense attorney just keeps talking about them as being runaways and—and somehow that they're throwaways. I hate that somehow the fact— |
|---|---|
| Defense: | Judge, I'm going to object. That's a—a misstatement of the testimony in this case. |
| Court: | Overrule the objection. |

Following the jury's deliberation on punishment, Vanterpool was sentenced on each count to ninety-nine years' imprisonment in the Texas Department of Criminal Justice–Institutional Division. The trial court announced that the sentences would run consecutively. *See* TEX. PENAL CODE ANN. § 3.03(b)(5)(A). This appeal followed.

## II. MOTION FOR MISTRIAL

By his first issue, Vanterpool argues the trial court erred in denying his motion for mistrial following the State's witness referencing a polygraph examination.

### A. Standard of Review and Applicable Law

We review a trial court's denial of a motion for mistrial for abuse of discretion. *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). To constitute an abuse of discretion, the trial court's decision must fall outside the zone of reasonable disagreement. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). We will not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable. *Webb*, 232 S.W.3d at 112. Only in extreme circumstances, when the error is incurable, will a mistrial be required. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

"Due to their inherent unreliability and tendency to be unduly persuasive, the existence and results of polygraph examinations are inadmissible for any purpose in a criminal proceeding on proper objection." *Martines v. State*, 371 S.W.3d 232, 250 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Tennard v. State*, 802 S.W.2d 678, 683 (Tex. Crim. App. 1990) (en banc)); *see Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012) (op. on reh'g). However, merely mentioning a polygraph examination does not automatically "constitute reversible error." *Jasso v. State*, 112 S.W.3d 805, 813 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd); *see also Reyes v. State*, No. 13-17-00035-CR, 2019 WL 1716794, at *5 (Tex. App.—Corpus Christi–Edinburg Apr. 18, 2019, no pet.) (mem. op., not designated for publication).

8

In determining whether a mistrial should have been granted on this basis, reviewing courts consider: "(1) whether the question exhibited bad faith by being designed to elicit that a polygraph was taken or what the results of that polygraph were; and (2) whether the effect of the evidence is to impeach the defendant's defensive theory or to bolster the [S]tate's case." *Buckley v. State*, 46 S.W.3d 333, 337 (Tex. App.—Texarkana 2001, pet. ref'd, untimely filed); *see Jasso*, 112 S.W.3d at 813. As a general rule, if a polygraph examination is mentioned at trial but the results are not revealed, then an instruction to disregard is sufficient to cure any error. *See Tennard*, 802 S.W.2d at 683; *Martines*, 371 S.W.3d at 250; *Jasso*, 112 S.W.3d at 813.

## B.    Discussion

When the State called Detective Clark in rebuttal, it played the interview with Vanterpool for the jury. As the interview played, Detective Clark referred to Vanterpool being offered a polygraph examination. The following colloquy then occurred:

| | |
|---|---|
| Vanterpool: | Judge, may—may we approach? I'm going to object to any reference to the offering of a polygraph. |
| State: | May we approach? |
| Vanterpool: | No. I need to make a motion. I'm going to object to any reference to a polygraph. Prior to the admission of this particular piece of evidence, I specifically asked the State to delete any references to polygraph, whether he took one, whether one was offered. They represented to me that they did that. Now I feel that the jury has been tainted because now there's information about polygraph out there. And I tried to safeguard and prevent that from happening. And for whatever reason—I understand we're having problems with the audio equipment. But now the jury has heard references to [sic] polygraph. Which when I, again, had no objection to this particular exhibit, it was with the |

9

|              |                                                                                                                                                                                                                                                                                                                                                                                              |
|--------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|              | understanding that there will be no mention of polygraphs. And for those reasons, I'll—I'll ask for a mistrial, Your Honor.                                                                                                                                                                                                                                                                    |

. . . .

| State:       | Prior to—I reviewed a copy of this that was a redacted copy, Judge, and we had taken all references out of that. I found one additional reference to that. I asked that it be taken out. And apparently—I don't know what's going on with—with this. I did review it. They were taken out previously. This—after this final one came out, I'm not sure why—why it has that. I agreed to take them out. They should have been taken out. And I agree with that, Judge. |
| Court:       | Okay. At this point I'm going to instruct the jury to disregard that evidence for any purpose whatsoever and I will deny the motion for mistrial. |
| Vanterpool:  | Okay. So—just so I'm clear, Your Honor. I am too asking the jury to disregard any mention of polygraph, but I am asking for a mistrial. |
| Court:       | I understand that. And I directed the—first of all, I'll sustain your objection to the evidence itself and I've instructed the jury to disregard it for any purpose whatsoever and I'm overruling the motion for mistrial. |

Vanterpool asserts that the trial court's instruction to disregard "was not enough to cure the harm caused by the State's evidence." However, Vanterpool needed to show more than a mere potential harm; he needed to demonstrate an incurable error that was so harmful as to require to the trial to be redone. *See Hawkins*, 135 S.W.3d at 77; *see also Reyes*, 2019 WL 1716794, at \*6. Here, the State had gone through the interview video and redacted any mention of a polygraph examination being offered, but technical difficulties caused a different version to play during trial. Detective Clark did not testify about offering a polygraph, did not mention the results of a polygraph examination or

10

imply that the results of the examination were unfavorable to Vanterpool. Lastly, the trial court gave an instruction to the jury to disregard the reference to the polygraph examination, and we presume jurors followed the trial court's instructions as presented. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005). Vanterpool has failed to demonstrate why the trial court's multiple instructions to disregard were ineffective. *See Tennard*, 802 S.W.2d at 683; *Martines*, 371 S.W.3d at 250; *Jasso*, 112 S.W.3d at 813. Therefore, we conclude that the trial court did not abuse its discretion in denying Vanterpool's motion for mistrial. *Webb*, 232 S.W.3d at 112. We overrule Vanterpool's first issue.

### III. STATE'S PUNISHMENT ARGUMENT

By his second argument, Vanterpool alleges the trial court erred in overruling his objection to the State's argument during the punishment phase of the trial as laid out in section D of the background.

During trial, Vanterpool objected to the State's argument on the basis of "misstatement of the evidence." However, in his brief, he states that the argument was improper because: (1) the prosecutor was expressing her personal opinion, and (2) the prosecutor was striking at Vanterpool over counsel's shoulders. In order to preserve a complaint for appeal, the record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context. TEX. R. APP. P. 33.1(a)(1). "An objection stating one legal basis may not be used to

11

support a different legal theory on appeal." *Villarreal v. State*, 590 S.W.3d 75, 79–80 (Tex. App.—Waco 2019, pet. ref'd). Therefore, because Vanterpool's complaints on appeal do not comport with his complaint made at trial, he has not preserved error for our review. We overrule Vanterpool's second issue.

### IV. JURY INSTRUCTION

By his third issue, Vanterpool states that the trial court erred by instructing the jury regarding its verdict form.

Article 37.01 of the code of criminal procedure provides that a "verdict" is a written declaration by a jury of its decision of the issue submitted to it. TEX. CODE CRIM. PROC. ANN. art. 37.01. Article 37.04 provides that an agreed verdict "shall be read aloud by the judge," and "[i]f in proper form and no juror dissents therefrom, and neither party requests a poll of the jury, the verdict shall be entered upon the minutes of the court." *Id.* art. 37.04. A trial court has no power to change a jury's verdict unless it is with the jurors' consent before they disperse. *Ex parte McIver*, 586 S.W.2d 851, 854 (Tex. Crim. App. 1979); *Hernandez v. State*, 533 S.W.3d 472, 484 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). "'It is not only within the power, but it is the duty of the trial judge, to reject an informal or insufficient verdict, call to the attention of the jury the informality or insufficiency, and have the same corrected with their consent, or send them out again to consider their verdict.'" *Nixon v. State*, 483 S.W.3d 562, 567 (Tex. Crim. App. 2016) (quoting *Reese v. State*, 773 S.W.2d 314, 317 (Tex. Crim. App. 1989)); *see* TEX. CODE CRIM. PROC. ANN. art. 37.10(a).

12

Here, the jury initially announced it had reached a verdict. When the trial court read the verdict forms, he stated it showed the jury found Vanterpool guilty of trafficking of persons and of the lesser-included offense of sexual assault of a child. He instructed the jury as follows:

> So, ladies and gentlemen, what I need to do is have you go back to the jury room. It—it wasn't real clear in—in the charge. I actually discussed this with someone about whether or not we should instruct you that you can only find one of those verdicts. And so what I need you to do is go back and deliberate, because a finding of guilt on the lesser included offense—you have to make a finding on one or the other, so it can't be both. Does that make sense?
>
> . . . .
>
> And so what I'll ask you to do is go back to the jury room, continue to deliberate, and let me know if you can reach a verdict based on that instruction.

Once the jury had reached a verdict, Vanterpool objected on the record stating:

> Just out of an abundance of caution, I would object on behalf of [Vanterpool] in regards to any additional instructions that were given to the jury regarding this particular verdict form. Given the fact that I believe that the—in my opinion, I believe that the verdict form speaks for itself and any additional comments on it would have been an improper instruction to the jury.

The foreperson certified that the verdict was unanimous and Vanterpool was found guilty of trafficking of persons, with the foreperson's signature crossed off of the lesser-included offense form.

The trial court did not err by sending the jury back for deliberations on the verdict. Because the initial verdict form contained guilty findings under both the charged offense and the lesser-included offense, it constituted an insufficient verdict. *See* TEX. CODE CRIM. PROC. ANN. art. 37.10(a). Therefore, the trial court had a duty to call the verdict form to

13

the jurors' attention and send them out again to consider their verdict. *See id.*; *Reese*, 773 S.W.2d at 317; *see, e.g., Hernandez*, 533 S.W.3d at 484 (concluding that "a trial court does not err when it orders the jury to further deliberate or correct the verdict form after the jury informs the court it made a mistake in filling out the verdict form"). We overrule Vanterpool's third issue.

## V. PUNISHMENT WITNESS NOTICE

By his fourth issue, Vanterpool argues that the trial court's finding of reasonable notice regarding the State's punishment witness was error.

### A. Standard of Review and Applicable Law

A trial court has broad discretion to admit or exclude extraneous offense evidence. *Ferrer v. State*, 548 S.W.3d 115, 118 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd). The trial court is the authority on admissibility of relevant evidence during the punishment phase. *Id.* at 119. An appellate court reviews a trial court's ruling on the admissibility of extraneous-offense evidence for an abuse of discretion. *Id.* A reviewing court should not reverse a trial court whose ruling was within the zone of reasonable disagreement. *Id.*

Both parties agree that the notice requirement under article 37.07, § 3 of the code of criminal procedure applies. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3 ("Evidence of prior criminal record in all criminal cases after a finding of guilt"). The notice requirement found in article 37.07, § 3(g) states:

> [i]f the attorney representing the [S]tate intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act.

14

*Id.* art. 37.07, § 3(g). However, "[t]he requirement under this subsection that the attorney representing the [S]tate give notice applies *only* if the defendant makes a timely request to the attorney representing the [S]tate for the notice." *Id.* (emphasis added). The reasonableness of the State's notice generally turns on the facts and circumstances of each case. *Ferrer*, 548 S.W.3d at 119.

**B.     Discussion**

Vanterpool stated that J.B.'s testimony was not included on the State's notice of extraneous offenses or bad acts. *See* TEX. CODE CRIM. PROC. ANN. § 3(g). However, as the State points out, Vanterpool never filed a request for the State's notice of intent to introduce extraneous offenses or bad acts under this section or under Rule 404(b) of the rules of evidence. *See id.*; TEX. R. EVID. 404(b).

Even though Vanterpool did not file a request for notice of extraneous offenses or bad acts, the State provided Vanterpool with notice as soon as J.B. contacted its office. During the hearing before the court, the State explained J.B. had come forward the day before and it provided defense counsel with the information required by article 37.07, § 3(g), as well as with a copy of the interview conducted by its investigator. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g). Upon hearing the explanation and argument of both parties, the trial court found that the notice given was reasonable and allowed J.B. to testify. Since the State gave notice as soon as practicable, we would conclude that the trial court did not abuse its discretion in allowing the testimony even if Vanterpool made a timely request for notice. We overrule Vanterpool's fourth issue.

15

## VI.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
5th day of August, 2021.

16