

## NUMBER 13-21-00272-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

DALTON DOUGLAS GREGORY, **Appellant,**

**v.**

THE STATE OF TEXAS, **Appellee.**

### On appeal from the 36th District Court
### of Aransas County, Texas.

## MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Silva**
**Memorandum Opinion by Justice Hinojosa**

A jury found appellant Dalton Douglas Gregory guilty of two counts of sexual assault of a child, a second-degree felony, and one count of child pornography, a third-degree felony. *See* TEX. PENAL CODE ANN. §§ 22.011(a)(2)(A), 43.26(d). The jury assessed a sentence of ten years' imprisonment on each count of sexual assault of a child and five years on the child pornography count, to run concurrently. *See id.* §§ 12.33–

.34. By one issue, Dalton[1] argues the evidence is insufficient to show he was guilty of two counts of sexual assault of a child. We affirm.

## I. BACKGROUND

At trial, the complainant B.G.[2] testified that she lived in Alaska with her mother, father, and younger brother P.G. until she was six years old. The day after her sixth birthday, her father committed suicide. B.G. moved with her mother Wendy and P.G. to Rockport, Texas to live with her maternal grandfather John Gregory and maternal step-grandmother Sheryl Gregory. Soon after the move, Wendy abandoned her children. B.G. and P.G. were subsequently adopted by their grandparents John and Sheryl.

B.G. testified that Sheryl was very strict and the "disciplinarian" in the family. B.G. was not allowed to have any friends come to the house to visit. When Sheryl disciplined the children, B.G. claimed she used "a belt and a hanger and shoes."

John and Sheryl had an older adult son, Dalton. Dalton was B.G.'s half-uncle[3]; he became her brother after John and Sheryl adopted B.G. B.G. testified that Dalton's behavior began changing toward her when she turned twelve years old. Her parents would leave to go to dinner or to church and would leave Dalton in charge of B.G. and P.G. During these times, B.G. said he would "walk up behind" her and tell her she had "a

---

[1] We refer to the defendant by his first name because the defendant and several witnesses share a surname.

[2] We use initials to protect the identity of minor complainants. *See* TEX. R. APP. P. 9.8 cmt.; *Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (noting that the comment to Texas Rule of Appellate Procedure 9.8 does "not limit an appellate court's authority to disguise parties' identities in appropriate circumstances"); *see also* TEX. CONST. art 1, § 30(a)(1) (providing that a crime victim has "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[3] B.G.'s mother Wendy was from John's prior marriage; Dalton was John's son with Sheryl.

2

really nice body" while her younger brother was preoccupied with a video game or schoolwork. B.G. testified that this behavior progressed to Dalton following her into the shower, pulling back the curtain, and staring at her. He also began touching her breasts both over and under her clothing. She stated that sometimes he would come into her room at night when everyone was asleep to try to touch her.

When B.G. was thirteen, Dalton began taking nude pictures of her when she was in the restroom with his Samsung cell phone. She testified about one of the photo exhibits during her direct examination, explaining that Dalton took a picture of her with "[her] shirt pulled down past [her breasts]." According to B.G., Dalton's assaults eventually escalated. B.G. testified that one day when she went into his room to play a video game, Dalton pushed her onto his bed and penetrated her vagina with his fingers. While digitally penetrating her, Dalton put his penis in a sock and masturbated. B.G. said that she tried to make him stop but eventually gave up because Dalton was physically stronger than her. The sexual abuse occurred whenever John and Sheryl were out of the house.

A few weeks later, Dalton began using hairbrushes to penetrate B.G. B.G. recalled that one time when he finished assaulting her with the hairbrush, Dalton took the sock off his penis and ejaculated into her mouth. All of these attacks occurred in Dalton's room. B.G. stated that every time Dalton would assault her, she would self-harm by cutting herself five to ten times. She "lost count at 245 cuts."

B.G. testified that she told the school counselor about her abuse. As proof of the abuse, she showed the counselor and later the school nurse some bruises she had on her thighs. B.G. stated that when the school called Sheryl to report the matter, Sheryl

3

explained that B.G. got the bruises from a fall at soccer practice. When B.G. was fourteen, she tried to commit suicide in a school restroom by hanging herself. B.G. explained that she had just learned that her mother Wendy had died a year before from a post on Dalton's Facebook feed—no one in her family had told her about the death previously. B.G. was taken to a therapist, whom she told about the sexual abuse. The therapist allegedly reported the outcry to Sheryl, but Sheryl did not believe B.G. B.G. testified that she told Sheryl about the abuse again when she was fifteen, but Sheryl still did not believe B.G. B.G. eventually ran away from home.

Aransas County Sheriff Deputy William Newsom testified that he found B.G. on September 17, 2016, at a rental property. B.G. was listed as a runaway and was sleeping when authorities found her. She had a backpack, knife, clothing, and some hygiene products with her. Newsom noticed scratch marks on her neck and a fresh laceration on her wrist. He also "noticed several other slash marks in different stages of healing" on her forearms.

Newsom transported B.G. to a medical facility in Portland, Texas. In the car, B.G. admitted that the marks were self-inflicted. She also told Newsom that she did not want to return to her home because of the sexual abuse.

Aransas County Sheriff Deputy Chief Armando Chapa testified that he contacted Child Protective Services (CPS) to report B.G.'s outcry after she was found at the rental property. This report led to an interview at the Children's Advocacy Center of the Coastal Bend (CAC). Chapa further testified that B.G. underwent a medical exam by a Sexual Assault Nurse Examiner (SANE) to further investigate B.G.'s claims.

4

Chapa helped execute a search warrant on the Gregory home on September 29, 2016. He stated that John and Sheryl were present during the search. Chapa found a black hairbrush that was listed as an item of interest on the warrant. Sheryl was in the room with Chapa when he informed a fellow officer what he had found and that he was going to his unit for an evidence bag. When Chapa returned to the restroom, however, the hairbrush was missing. Chapa testified that he panicked and asked his fellow officers if they had taken the evidence. They responded that they had not. When Chapa asked Sheryl if she had taken the hairbrush, she first responded that she did not know what happened to it. When Chapa pressed her on the matter, she admitted that she had thrown the hairbrush under the sink counter. Chapa asked her: "Ms. Gregory, why would you do that? You're tampering with evidence." Sheryl responded, "I got scared." At that point, Chapa escorted her from the house. DNA testing did not reveal any conclusive DNA evidence from the hairbrush.

Aransas County Sheriff Investigator Rodney Cox testified that officers recovered a Samsung Galaxy S7 Edge phone during the search. Frank Garibay, a Network Intrusion Forensics Analysis with the United States Secret Service, assisted the Aransas County Sheriff's Office during this investigation. Garibay testified that he recovered numerous photos and videos of a sexual nature from Dalton's phone, including a photo of B.G. in a state of undress.

Penny Green, a CAC forensic interviewer, testified that she interviewed B.G. Green stated that B.G. was reticent to start the interview and was emotional at times. B.G. told Green how the abuse began at age twelve with Dalton fondling her breasts and

how it eventually escalated to the penetration of her vagina. B.G. repeated that Dalton would cover his penis with a sock and masturbate with one hand while vaginally penetrating her with his other hand digitally or with a hairbrush. Penny Gaddis, a Sexual Assault Nurse Examiner (SANE), explained that a SANE exam gathers the history of a sexual assault complainant. The exam also assesses the patient to determine if labs, tests, or further treatment is needed, such as emergency contraception or counseling referrals. Gaddis noted that the last time B.G. claimed she was assaulted was over fourteen days prior to the exam and she did not have any inflicted injuries that were recent. Gaddis explained, though, that the female genitalia heals rapidly.

During the pendency of this case, CPS found foster parents for B.G.—her aunt and uncle William and Samantha Moore in Alaska. B.G. testified that she was in and out of mental facilities between the ages of sixteen through eighteen due to the trauma she had survived.

Sheryl testified that she and her husband adopted B.G. and P.G. when the children's father committed suicide because the children's mother "was doing drugs and being a dealer." She admitted to having strict rules and being the disciplinarian in the home. Sheryl recalled that B.G. ran away when she was fifteen. She testified that the first time she heard allegations about B.G. being abused by Dalton was when she went to the hospital after B.G. was found by authorities. She explained that she was "a nervous wreck" when authorities came to her home to execute the search warrant. She admitted that she moved the hairbrush because she was "scared" and wanted to protect her son even though she did not believe that Dalton had done anything wrong. Sheryl testified

6

that the "mamma bear just came out" and she does not believe Dalton sexually abused B.G. "[b]ecause he was raised better than that." Sheryl acknowledged that she and B.G. had a "rocky" relationship. She believed B.G. was jealous of Dalton because Sheryl gave him certain privileges due to his older age that she would not afford B.G. or P.G. Sheryl stated that B.G. called her from Alaska and left her the following voicemail:

> Hi Sheryl, it's [B.G.]. I know you probably never wanted to hear from me again. I'm just calling to apologize for destroying your life and making it hell. I hope that one day you can find it in your heart to forgive me. I'm sorry.

John testified that the reason he did not tell B.G. that her mother passed away was "because we felt that she had enough trauma in her life already, and if we told her that, it would traumatize her even more." He stated that he was trying to protect her. He also did not believe that Dalton sexually assaulted B.G.

Dalton testified in his defense. He denied ever assaulting B.G. He testified that he is a "gamer" who plays games competitively on his personal computer—sometimes up to eighteen to twenty hours a day. He admitted that all of his friends were people that he met online. Dalton explained that some of the photos Garibay found on his phone were from two of his previous relationships. Both of his previous girlfriends were from Canada. Dalton claimed that he had fallen in love with these women. During their relationship, the women would send him "sexual pictures" of their genitalia and them performing sexual acts. He would reciprocate by sending graphic pictures of himself. One of his girlfriends sent him pictures of her masturbating with a hairbrush.

Dalton did not know how a picture of B.G.'s exposed breasts was found on his phone. He claimed that B.G. had access to his phone, though, because he allowed her

to play video games on his phone. He testified that he gave officers his phone password during the search because he "wanted to cooperate" and had "nothing to hide." He stated that B.G. became more resentful of him and his parents after she found out that they had hidden her mother's death from her.

A jury found Dalton guilty of two counts of sexual assault of a child and one count of child pornography. *See* TEX. PENAL CODE ANN. §§ 22.011(a)(2)(A); 43.26(d). The jury assessed a sentence of ten years on each count of child sexual assault and five years on the child pornography count, to run concurrently. *See id.* § 12.33–.34. Dalton appeals.

## II.     STANDARD OF REVIEW & APPLICABLE LAW

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018); *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594

8

S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Walker*, 594 S.W.3d at 335; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Walker*, 594 S.W.3d at 336.

The elements of sexual assault of a child are: (1) a person; (2) intentionally or knowingly; (3) regardless of whether the person knows the age of the child at the time of the offense; (4) causes the penetration of the anus or sexual organ of a child by any means. TEX. PENAL CODE ANN. § 22.011(a)(2)(A).

### III.  ANALYSIS

By his sole issue, Dalton contends the evidence was insufficient to show that he committed two counts of sexual assault of a child. *See id*. Dalton notes that there was no physical or forensic evidence proving that he penetrated B.G. with his fingers or a hairbrush. He contends instead that B.G. was seeking "retribution against [Sheryl] by

making allegations of sexual abuse about her son."

Dalton concedes that a complainant's testimony alone can sustain a conviction for child sexual assault. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1) (requiring no corroboration of a child victim's testimony if a defendant violates § 22.021 of the penal code); *Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.). Here, B.G. gave explicit testimony regarding the manners in which Dalton violated her—using both his fingers and a hairbrush. Her account remained consistent when she discussed her assaults with both Green and Gaddis. This evidence alone can support the convictions for child sexual assault. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1).

Dalton points out that there was no physical evidence presented to prove these allegations of sexual assault. First, Dalton asserts that no DNA evidence was found on the hairbrush seized during the execution of the search warrant at the Gregory home— not even from hair strands. However, the trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). The jury could have reasonably surmised that Sheryl had enough time to clean or sterilize the hairbrush when Chapa went to his police unit to obtain an evidence bag to seize it. Second, although Gaddis found no injury to B.G.'s genitalia during her SANE examination, Gaddis also explained that the female genitalia heals quickly such that she would not expect to find injury fourteen days after an assault.

Dalton also argues that B.G. had access to his phone and therefore could have seen the images of sexual acts using a hairbrush, thus inspiring her outcry "story." He

10

also said there was "a motive for B.G. to make these statements" because B.G. wanted to punish Sheryl for her physical abuse. He contends that the voicemail message B.G. left on Sheryl's phone, wherein B.G. apologized for "destroying" Sheryl's life and "making it hell," is evidence of this motive. Again, however, we must defer to the jurors' decision on the evidence. *See Brown*, 270 S.W.3d at 568. Here, it appears that the jury believed B.G.'s testimony over Dalton's, and we cannot disturb that decision. *See id.; see also Acevedo v. State*, No. 04-05-00575-CR, 2006 WL 3611379, at *2 (Tex. App.—San Antonio Dec. 13, 2006, pet. ref'd) (mem. op., not designated for publication) (noting in a child sexual assault case that "the jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony, and the jury may choose to accept or reject any or all testimony of any witness").

B.G.'s testimony, standing alone, supported the child sexual assault convictions. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1). Accordingly, we conclude that a rational trier of fact could have found the essential elements of the crime of child sexual assault beyond a reasonable doubt. *See Stahmann*, 602 S.W.3d at 577; *see also Jackson*, 443 U.S. at 319.

## IV. Conclusion

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
Tex. R. App. P. 47.2 (b).

Delivered and filed on the
30th day of June, 2022.

11