

# NUMBER 13-23-00561-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**JUAN MANUEL CASARES,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

## ON APPEAL FROM THE 83RD DISTRICT COURT
## OF VAL VERDE COUNTY, TEXAS

## MEMORANDUM OPINION

**Before Justices Silva, Peña, and Fonseca**
**Memorandum Opinion by Justice Silva**

A jury found appellant Juan Manuel Casares guilty of two counts of indecency with a child by sexual contact, second-degree felonies. *See* TEX. PENAL CODE ANN. § 21.11(a), (d). The jury also found the State's habitual-felony-offender enhancement allegations true, *see id.* § 12.45(d), and assessed punishment at forty years' imprisonment for each count, with the sentences to be served consecutively. By three issues, Casares argues

that (1) the trial court erred when it failed to sua sponte conduct an informal inquiry into his competency to stand trial, (2) the trial court erred when it denied his court-appointed counsel's motion to withdraw from representing Casares, and (3) that he suffered from ineffective assistance of counsel. We affirm.

## I.     BACKGROUND[1]

### A.     Competency to Stand Trial

On November 30, 2018, Casares was indicted on two counts of indecency with a child by sexual contact involving complainants "Jennifer" and "Paula."[2] On February 21, 2019, Casares's court-appointed defense counsel Jad Harper filed his first motion suggesting that Casares was incompetent to stand trial and requesting an examination. On February 25, 2019, the trial court ordered Dr. Jarvis Wright to conduct a psychological examination of Casares for competency to stand trial. On June 27, 2019, Wright filed his report finding Casares incompetent. Wright indicated in his report that during the examination, Casares "spoke rapidly, talked very loud[,] and did not stop talking[,]" and noted that "[h]e dwelled on the theme of a conspiracy by ['Yvette'[3]] and his probation officer." However, Wright also noted that Casares's "suspicions were possible in real life and did not constitute bizarre delusions." Wright found that Casares experienced an

---

[1] This appeal was transferred from the Fourth Court of Appeals in San Antonio pursuant to an order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001(a). We are required to follow the precedent of the transferor court to the extent it differs from our own. TEX. R. APP. P. 41.3.

[2] To preserve the complainants' privacy, we identify them and related individuals by pseudonyms. *See* TEX. R. APP. P. 9.8; *Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (noting that the comment to Texas Rule of Appellate Procedure 9.8 does not limit an appellate court's authority to disguise parties' identities in appropriate circumstances).

[3] "Yvette" is the mother of the child complainants involved in this case.

"episode of mania" at the time of the examination and may suffer from bipolar disorder. Wright concluded that Casares demonstrated "no ability to recognize facts and events that might be pertinent to his defense"; "no ability to cooperate with counsel by disclosing pertinent facts, events[,] or states of mind"; and "no ability to engage in a reasoned choice of legal strategies." On July 15, 2019, the trial court found Casares incompetent to stand trial based on Wright's competency evaluation and ordered that he be committed to the Texas Department of State Health Services for further examination and treatment "toward the specific objective of attaining competency to stand trial."

On March 4, 2021, North Texas State Hospital (NTSH) admitted Casares pursuant to the trial court's order for further examination and treatment. In a letter dated May 12, 2021, the Texas Health and Human Services Commission (HHSC) informed the trial court that "[a]fter a period of observation and treatment," Casares was incompetent to stand trial and suggested that he be further committed. Attached to the letter was a trial competency evaluation report by Dr. Andreana Augustus, dated May 8, 2021. Augustus's report indicated that she diagnosed Casares with "Bipolar Disorder, Not Otherwise Specified," and that he was incompetent to stand trial but "restorable to trial competency in the foreseeable future." Augustus also opined that Casares was "unable to demonstrate an adequate factual and rational understanding of his current charge and the potential consequences of the pending proceedings"; that his "capacity to disclose the relevant facts, events, and states of mind regarding the alleged offense" were "impaired due to symptoms of mental illness (mood instability/mania) that interfere with his trial competency-related abilities"; he is "unable to demonstrate a minimally logical, cogent,

3

and organized discussion of possible legal strategies and options available to him with respect to resolving his current charge due to active symptoms of mental illness"; he demonstrated "an impaired understanding of the adversarial nature of criminal proceedings, and his responses were indicative of the ongoing active symptoms of mental illness"; he "is unable to provide a minimally cogent answer to most queries" and "his capacity to exhibit appropriate courtroom behavior . . . should be regarded as impaired due to ongoing symptoms of mental illness"; he was "willing but unable to demonstrate an ability to collaborate with defense counsel, due to his active symptoms of mental illness"; he did not have "adequate capacity to maintain attention and concentration sufficient to withstand the stressors of Court"; and he did not "possess the capacity to testify relevantly due to active symptoms of mental illness."

On June 8, 2021, the trial court held a recommitment hearing. At the hearing, Dr. Feroz Yaqoob testified that he was a staff psychiatrist at NTSH and examined Casares for purposes of recommitment. Yaqoob testified that:

> [Casares] continues to have disorganized thought process, he continues to say his charges have been dropped. . . . [H]e's currently court ordered to take his medications due to refusal. He continues to make delusional statements regarding the judge and . . . his charges and everything else. So at this time he cannot . . . rationally understand his charges and cannot defend himself in the Court.

Yaqoob diagnosed Casares with "bipolar disorder, not otherwise specified," and explained that "Bipolar is mania and depression or manic depression," which are "different names for the same illness." When asked if Casares had progressed since being committed, Yaqoob stated:

> Well, I have reviewed the chart, there's some progress, I think, he may need

4

some medication adjustment because he's still pretty delusional in terms of his charges and in terms of the understanding of the nature of the proceedings, his pending charge and, you know, he still believes that his charges have been dropped in the past and those are not his current charges. There probably have been other charges in the past that he's still thinking that they, you know, the charges were dropped and he doesn't need to be here and needs to be released. So his understanding of his current charges are still, you know, not, you know, rational understanding is not there. So I think he may need some adjustment to the medications and hopefully with that in the foreseeable future he may be able to regain competency.

In addition, Dr. Kevin Brown testified that he did a separate evaluation of Casares, and informed the trial court of the nature and severity of Casares's mental illness:

[W]hen I talked to . . . Casares on exam, he was speaking rapidly. He kept perseverating possibly he should be let out, and . . . his charges were dropped, he displayed poor insight on judgment, and he also appeared to make a [delusional] statement to the judge that . . . ordered him to come here was not a real judge, and he was also irritable at times when talking about aspects related to his competency or his care here. In other words, he would escalate very easily. My opinion was that he does have a major mental illness and he would need further inpatient care to stabilize his symptoms.

Brown opined that it was necessary for Casares to continue his bipolar disorder medication to obtain competency. At the end of the hearing, the trial court indicated it was going to order an extension of mental health services for Casares. On June 9, 2021, the trial court signed an order finding Casares incompetent to stand trial and mentally ill, that he met the criteria for court-ordered extended in-patient mental health services, and that he was to remain committed with NTSH for a period not to exceed twelve months.

In a letter dated November 15, 2021, HHSC suggested to the trial court that Casares was competent to stand trial and requested that he be transported back to the county for further court proceedings. Attached to the letter was a second evaluation report

by Augustus dated November 8, 2021. Augustus opined that Casares "improved markedly during his course of hospitalization to evidence sufficient factual and rational understanding of his charge and the gravity of potential consequences of the pending proceedings in his case"; he was able to "demonstrate a capacity to disclose to counsel pertinent facts, events, and states of mind"; he had "adequate capacity to engage in a reasoned choice of legal strategies and options"; he exhibited "sufficient factual and rational comprehension of the adversarial nature of judicial process"; "it is reasonable to anticipate that he could manifest appropriate [c]ourtroom behavior through the duration of trial proceedings"; and he was "able to engage in a collaborative relationship with his defense counsel." Augustus concluded that after treatment and participation in trial competency instruction, Casares's thought process is "logical, organized, cogent, and goal-directed" and he is "presently COMPETENT TO STAND TRIAL." However, she strongly recommended that Casares "continue to receive ongoing psychiatric services, and that he continue[] to adhere to the recommended medication regimen until disposition of his charge to minimize the potential that he may regress, which may again call into question his trial competence."

On May 12, 2022, Harper filed his second motion suggesting Casares was incompetent and requested another examination. On May 13, 2022, the trial court ordered Dr. Leana Talbot to examine Casares for competency to stand trial. Talbot conducted the examination on June 28, 2022, and submitted her written report to the trial court on July 18, 2022. In her report, Talbot noted that Harper informed her that Casares "had discontinued his medications after returning to Val Verde County, which has impacted his

6

mental health"; that Casares was "experiencing 'manic behaviors' and struggling to stay focused and engaged"; and that "communication with [Casares] is difficult, which makes it challenging to collaboratively engage with him." Talbot further noted that Casares "speaks quickly and appears to have some intensity in his actions"; that Harper observed "periods of mania, though that wasn't fully evident at the time I assessed [Casares]"; and that Casares "demonstrates conspiratorial beliefs and delusional thinking, though none are bizarre or outside the realm of something that could be true." Talbot reported that, "Though . . . Casares is a person with mental illness, he had both factual and rational understanding of the charges against him and good legal knowledge" and he "was able to engage in a mostly rational and reasonable way during the assessment and appears to have sufficient present ability to consult with his attorney with a reasonable degree of rational understanding." Talbot recommended that Casares be considered competent to stand trial. Nevertheless, she noted that though Casares "met the competency standard without medication, however, some people with mental illness may decompensate significantly after a longer period of time without medication" and "[i]t is not clear whether medication is necessary for maintaining his competency, but it is recommended to provide benefits in mood stabilization and increasing rational thinking." After Talbot submitted her report, trial court proceedings commenced.

## B.    Voir Dire

Jury selection for Casares's trial took place at about 9 a.m. on October 30, 2023. At this time, Casares was represented by court-appointed defense counsel Alberto Ramon. As the trial court addressed the venire panel regarding qualifications and

7

exemptions for jury service, the following exchange occurred:

| THE COURT: | Anybody want to claim that exemption? Okay. Come on down we'll have you just report out. |
|---|---|
| [Prospective Juror]: | 80. |
| THE COURT: | 80, okay. |
| [Casares]: | Your Honor, excuse me. |
| THE COURT: | No. |
| [Casares]: | Your Honor— |
| THE COURT: | Sit down. Sit down. Sit down. Sit down. |
| [Casares]: | I got this right here. |
| THE COURT: | Sit down. |
| [Casares]: | Bring—bring me to double jeopardy— |
| THE COURT: | Sit down. |
| [Casares]: | I've been a long time ago—I've been incarcerated for five years and I've been locked up. |
| THE COURT: | Take him out. Take him out. |
| [Casares]: | My probation officer will tell you. I don't want Alberto Ramon with me. I bring my lawyer. I bring my lawyer. |
| THE COURT: | Thank you, take him out. |
| [Casares]: | I bring my lawyer, not Alberto Ramon. I've been in court a long time ago. |
| THE COURT: | Take him out. Thank you. |

After Casares was removed from the courtroom, the trial court resumed addressing the

8

venire panel, excused some from jury service, and released the rest for the remainder of the morning. Outside the presence of the venire, the trial court addressed Casares's removal from the courtroom:

| THE COURT: | Okay. Counsel, we're outside the presence of the panel. The Court had to remove [Casares], this is not unexpected. His behavior has been exhibited over the course of the time of this trial has been disruptive. Mr. Ramon was aware that more than likely this was going to happen. |
| --- | --- |
| [Defense Counsel]: | Correct, Your Honor. |
| THE COURT: | All right. The Court is going to endeavor to setup a closed circuit provision between now and 1:00 [] where [Casares] will be able to view and hear the court proceedings via [Z]oom and that way he'll have access to counsel, counsel will have access to him but we intend to continue these proceedings. [Casares] has been incarcerated approximately five years. He[] has been to multiple mental health evaluations. Each time he's been evaluated he's come back as competent [sic]. This is his second counsel Mr. Ramon. You don't mind if [I] say you['re] 80 years old, right? |
| [Defense Counsel]: | 83, going on 84 on the 12th. |
| THE COURT: | He's one of the most patient individuals I've known and taken on very difficult cases in the past and he's licensed in both federal and state court here. This is [Casares's] second counsel. Mr. Ramon, do you want to put anything else on the record? I'm just trying [to] let the appellate court know that we are attempting and endeavoring to have [Casares] participate in a way that is meaningful; however, the Court cannot allow him to disrupt our solemn court proceedings and that's why I had him removed. Did you agree with the removal, Mr. Ramon? |

9

[Defense Counsel]:    I do agree, Your Honor, I do believe that it would be—

THE COURT:    You can sit down. Y'all can sit down.

[Defense Counsel]:    —in the best interest of [Casares] that he be allowed to participate through [Z]oom. If this were to happen in front of the jury, it would be certainly not to his advantage at all.

THE COURT:    Okay.

[Defense Counsel]:    He has been an uncooperative client. Disappointed that his family [has] also bec[o]me uncooperative. I would do my best. I will honor my oath as a lawyer and I represent to this Court and I will represent to [the prosecutor] as a representative of the state that I will do my very best to be as professional as I can given the circumstances.

THE COURT:    I didn't ex[pec]t anything else Mr. Ramon when I appointed you.

[Defense Counsel]:    Thank you.

THE COURT:    [Prosecutor], [is] there anything that you wish to put on the record at this time[?]

[Prosecutor]:    Nothing[,] Your Honor.

THE COURT:    Okay. Then we are going to endeavor—

[Defense Counsel]:    I would like to have one more thing put on the record. We reopened the offer this morning.

[Prosecutor]:    We told the defense to ask if he's open to an offer and he doesn't seem to be.

[Defense Counsel]:    Correct, Your Honor[.] I do want to put that on the record. I do have another conference, a final conference with Mr. Casares. He understands and refuses to accept though that this is an enhanced case and the Court admonished him

10

last week and he said it on the record that he wants to go forward. He has never waived at any time from persistent on a trial. Now, he is fully aware of [and] the family is [ ] also aware[—]I want that to be clear on the record. They're fully aware of what [h]is situation is. He, basically, would be walking if he accepted the plea; but I was not able to convince him or the family. And I wanted to [be] absolutely clear that I did my best with the family and with Mr. Casares.

THE COURT: Okay. All right. Then that's on the record and we will also—I would like to tell [d]efense counsel that if at any time [Casares] would peaceably sit in proceedings, he's more than welcome to come back in.

[Defense Counsel]: I will keep [a]n eye open, but I do not expect that he will, not given the circumstances.

THE COURT: I more than welcome him being here for this trial. I cannot have him disrupting the trial.

[Defense Counsel]: We have to do the best we can and protect his constitutional rights and I know the state will do that and certainly we have an excellent judge.

THE COURT: Well, we're doing our best. I'm not going to say anything about me.

After a brief adjournment, trial proceedings resumed at 12:49 p.m., and the trial court addressed Casares, via Zoom, outside the presence of the venire members:

THE COURT: We are outside the presence of [the] venire. [Casares] has now arrived. I'm going to address myself to Mr. Casares. He was present earlier when we were doing the qualifications and exemptions of the venire. Mr. Casares had to be removed and stood up and started talking after I told him not to. I'll advise Mr. Casares I would like [for] you to participate in this trial and I would like you to be here. I want you to be able to consult with your attorney. I want you to

11

participate fully in your trial. I welcome you here in this trial; but I cannot have you disrupting the trial.

So as long as you can behave yourself and talk to your attorney in a low voice and everybody can hear, I'll be happy to have you in the courtroom. But I cannot have you talking over me. I can't have you talking over the counsel—

Hold on, lower your hand, lower your hand. I want you to be able to confer with your attorney, and I want you to be able to participate in your trial fully. This is as very important trial for you. There's a lot at stake. But I can't have you disrupting these proceedings. If you disrupt the proceedings[,] I have to remove you because we have to do this in an orderly manner. Do you understand what I'm telling you, Mr. Casares?

[Casares]:    I just want to say Harper told me a long time ago that you people will try to double jeopardy. Harper told me. I'm not saying, Your Honor, for real. I'm not saying I'm perfect. But Harper told me this come [sic] he would—and get he said it was double jeopardy and the state hospital that sent me, they told me I was not crazy and nothing like that, you to go trial.

And tell them to tell Harper, to tell me to Harper, if they do you double jeopardy, the first person to go wrong is to him. This account, he went and tell you this and that—I'm not saying they are perfect. I'm telling you straight up. I know I'm not perfect but this lady I was at for real, they were messing around with probation officers. They set me up.

But, hey, Harper told me also when I tell him the conversation and they—the detective that arrest me, they did the investigation, and Harper told me everything came in your favor Casares. [In] 2019 when you told me, you were going to send me to hospital, you didn't want to do nothing to

12

me and you were from the federal side to the—from the state side to the federal side. I've been waiting over there in the state side over five years there.

THE COURT: Can you behave yourself so that we can conduct you[r] trial in an orderly manner?

[Casares]: I'll behave myself just give me a chance please to express myself. I'm not saying I'm perfect this and that, for real. But they set me up, Your Honor, for real.

THE COURT: As long as you can stay in here and you do not . . . disrupt proceedings, I will let you stay here. But if you disrupt proceedings[,] I have to remove you.

[Casares]: Even [Yvette], when she come and show you 8 or 10 months ago the accident happened in May 2017, I was in the half way house.

THE COURT: Okay. I'm going [to] tell you, I do not want to talk to you directly, only your lawyer is going to be.

[Casares]: My lawyer is Harper.

THE COURT: No, your lawyer.

[Casares]: My lawyer—

THE COURT: No, I'm not—

[Casares]: Call in Austin. They told me your lawyer is Harper. Don't be lying, they told me.

THE COURT: Your—

[Casares]: Harper is my lawyer. They told me in Austin. I already called them.

THE COURT: No.

[Casares]: Harper for five years, my lawyer. Alberto Ramon

13

|  |  |
|---|---|
|  | because you guys knew I was going put somebody there. Knew you be put him in the bill [sic]. |
| THE COURT: | Mr. Casares, will you be able— |
| [Casares]: | No, sir, if you not going let me talk, no, for real. I'm not trying—judge have you guys nothing like that but [Yvette] and my probation officer, they set me up. This time they got fired from the federal courthouse 2019, they got arrested. |
| THE COURT: | Okay. All right. Then. |
| [Defense Counsel]: | You— |
| [Casares]: | I'm not saying I'm perfect, this and that, also nothing against you guys, for real but, hey, yo . . . my girlfriend and my probation officer, they were having an affair with her. |
| THE COURT: | All right. Thank you. |
| [Casares]: | God bless you-all. |
| THE COURT: | Thank you, sir. Just for the record, I'll try to do this again after voir dire and he wants to behave. |

Thereafter, the venire members were brought back in the courtroom. The trial court informed the venire that Casares's counsel was present and that Casares was "upstairs on the third floor" watching the proceedings via Zoom. Voir dire proceeded without interruption and a jury was selected and empaneled. The State read the indictment to the jury and Casares's counsel pleaded not guilty on Casares's behalf. The jury was then released for the day.

On October 31, 2023, the trial court addressed Casares in open court, outside the presence of the jury:

14

| | |
|---|---|
| THE COURT: | . . . Going to afford Mr. Casares the opportunity to stay in court. |
| | . . . . |
| [Casares]: | Okay. |
| | . . . . |
| THE COURT: | Thank you, sir. I'll permit Mr. Casares to be present during his trial as long as he'll comport himself and stay calm and then I think it's important for you to be here and sit here. Just don't talk. You can talk to your attorney at the breaks or write notes to your attorney but don't disrupt the proceedings, okay? |
| [Casares]: | Okay. |
| THE COURT: | Thank you, sir |
| [Defense Counsel]: | Your Honor, if I may, I'm tempted to confer with the—my client, Mr. Casares, regarding his children being called to testify. At one point he absolutely wanted them not to participate. |
| THE COURT: | Okay. |
| [Defense Counsel]: | I have—I believe they can be of some help but he's keeps insisting that I consult Mr. Harper. He still considers Mr. Harper his lawyer. |
| THE COURT: | I understand. |
| [Defense Counsel]: | Again, reiterate the attorney-client relationship here is very weak if not non-existent. |
| THE COURT: | Okay. |
| [Defense Counsel]: | And I, of course, want my client to be here. That's his absolute right and, of course, I would have no objection to that and I hope that he will comply. |

15

The trial court then proceeded to conduct a hearing regarding the admissibility of extraneous offense testimony from a particular witness at the request of Casares's counsel. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37. Thereafter, the jury entered the courtroom, and the prosecutor provided its opening statement. Casares's counsel waived the opportunity to present an opening statement.

## C.    Trial

Jennifer was born in November of 2008 and was fourteen years old at the time of trial. Jennifer testified that she previously lived in Del Rio with her siblings, her mother, and her mother's boyfriend, Casares. Jennifer stated that when she was nine or ten, her mother and sisters went to the grocery store while Casares, Jennifer, and Jennifer's brother stayed at their residence. Casares was drunk and sat on a chair in the living room. Casares told Jennifer to sit on his lap. Jennifer sat on his lap, facing away from him. According to Jennifer, Casares grabbed her waist with one hand, and used his other hand to touch her chest underneath her shirt. Thereafter, Jennifer felt uncomfortable, got off Casares's lap, went to her room and cried. Jennifer did not tell her mother what happened when her mother returned home because she was afraid of Casares and embarrassed. Jennifer later outcried to her mother about the incident and her mother reported the incident to law enforcement the next day. Jennifer did not recall the exact date she told her mother but stated she did so when she was in fourth grade at the time.

Paula was twenty-one years old at the time of trial and testified that Casares moved in with her family when she was fourteen years old. Paula stated that around September or October of her ninth-grade school year, Casares touched her breasts with both of his

16

hands outside of her clothes while she was asleep in her bed. After he touched her, Paula cried and got under the covers. According to Paula, Casares did not leave her bedroom until she cried louder. Paula testified about other incidents that had occurred in Mexico where Casares had touched Paula's buttocks underneath her pajamas, had lifted her dress and touched her legs, and had touched her upper legs and "private part" when she sat on his lap. Paula stated that Casares gave her money "every time that happened." Paula further stated that Casares threatened to kill her if she told her mother the second time she was touched. In addition, Paula testified that Casares would call her cell phone at 2 a.m. and would not talk but make "moaning" sounds. Paula stated she received several of these calls. Paula outcried to her mother about the incidents involving Casares on the same day her sister Jennifer told her mother about what Casares did to Jennifer.

Yvette, the complainants' mother, testified that she and Casares were previously in a relationship and had lived together. Yvette stated that she had left her residence with her older daughters on May 10, 2018, to send a money order to Casares's daughter. Jennifer and her brother stayed at home with Casares, who was drinking beer at the time. When Yvette returned, she noticed that Jennifer was crying. Yvette asked Jennifer if Casares had scolded her and Jennifer replied no. Yvette asked Jennifer if she had a headache and Jennifer said yes. Yvette testified that Jennifer later told her that Casares had touched her breasts on the day she went to get the money order. According to Yvette, she had broken up with Casares and he had already stopped living with Yvette and her children at the time Jennifer and Paula told her about the touching incidents.

Steven Moreno, Casares's former federal probation officer, testified that Yvette

17

visited his office in July of 2018 and informed him of what Casares had done to her daughters. Moreno thereafter called the Del Rio Police Department (DRPD) and arranged for Yvette to speak to someone there. According to Moreno, Yvette spoke to an investigator named Michelle that day. Moreno stated that there were concerns regarding how Casares would react when he found out about the allegations against him. Moreno explained that law enforcement "needed the time to do their investigation and . . . they had advised [Yvette] not to gather [Casares's] belong[ings] and throw him out." Moreno also testified that he told Yvette that she needed to "work with [Casares] and give [law enforcement] the time they needed to complete the investigation and get the warrants issued." According to Moreno, Casares was arrested in September of 2018. Moreno also stated he was aware that Casares had alleged that Moreno and Yvette were having an affair. Regarding this allegation, Moreno testified there was "no truth to it." Moreno explained that he and a partner would make unannounced visits to Casares "at any given day or . . . time," as well as "'collateral visits'. . . with spouses, sons, daughters, and neighbors." Moreno further added, "Sometimes I would catch . . . Casares there if he was in [Del Rio], sometimes I wouldn't. Sometimes he was working in Big Lake." Moreno explained that these visits were part of his job and that his visits to Yvette and her children were "professional only." Moreno testified he had informed his supervisor about Casares's allegations.

Michelle Salinas, a former investigator with DRPD, testified that Yvette filed a police report on July 25, 2018. According to Salinas, Yvette continued talking to Casares after filing the report and acted normal so as "to get him back to Del Rio" because he was

18

working in Big Lake. Salinas stated that "[Yvette] thought that if she would have made him aware that the police knew" about the allegations, "he would not come back," and "[Yvette] wanted to make sure we got him—I guess, arrested for what he had done." On September 24, 2018, Salinas interviewed Casares after he was arrested. The interview was recorded on a body camera, and the recording was admitted into evidence. In the beginning of the interview, after he was read and waived his *Miranda* rights, Casares stated that he had been living with Yvette for a year and a half, and that Yvette had been cheating on him with his probation officer. Casares explained that his probation officer had been going to the residence he shared with Yvette when he was not there, that his probation officer gave him permission to go to Big Lake, and that he had been in Big Lake for over a year. Casares stated that his cell phone was "tapped," and that Moreno had "got on the line" while Casares had been talking to Yvette. In addition, Casares claimed that Yvette "prostituted" her daughters "every Saturday" in Mexico and that his probation officer would visit his residence every Saturday.

In the recorded interview with Salinas, Casares denied touching Jennifer or Paula inappropriately, but admitted that they sometimes sat on his lap, and he would hug them in Yvette's presence. When asked why Yvette, Jennifer, and Paula would lie about the allegations made against him, Casares responded, "They are playing a joke on me. [Yvette] and the probation officer. They want me to go to jail and prison." Later in the interview, Casares, unprompted, stated that he never gave the complainants money in exchange for touching them.

At trial, Casares testified in his own defense with the assistance of a Spanish

19

language translator. During his testimony, Casares generally denied the testimony and evidence admitted against him and echoed his statements made during the recorded interview with DRPD. Casares also testified regarding whether he was "mentally examined" as ordered by the trial court during the pendency of the case:

[Defense Counsel]: Now, during the [pendency] of this case, were you examined mentally?
. . . .

[Casares]: Yes, because I found out that [Yvette] was cheating on me and then they told me that I was crazy. They locked me up and told me that I was crazy.

[Defense Counsel]: Now, I'm talking about any examinations done at the direction of the Court. You were mentally examined and a report was given to the Court, "yes" or "no"?

[Casares]: They did an evaluation on me in 2018 to 2019. They told me I was fine they did another one in 2020 and they said I was fine. They did another one '21 and '22 and they said I was fine. It was three times and they said that I was fine.

[Defense Counsel]: During those examinations were you ever asked questions regarding your sexual orientation or tendencies or that subject matter?

[Casares]: Yes, I was sent to the state hospital where they have the crazy people and I was over there by Boerne that area over there and I was over there from 8 to 10 months, between 8 and 10 months and I was there and doing school and doing the classes and everything.

[Defense Counsel]: Did you cooperate with your psychiatrist?

[Casares]: Yes, I did. I did—they told me that I was fine and that I was a good worker and that I was kind and that there was nothing wrong with me. They had

20

everything in general.

Later, during cross-examination by the prosecutor, the following exchange occurred:

[Prosecutor]: Are . . . you also claiming that the state system has kept you wrongfully in the state hospital in the years that you've been awaiting trial?

[Casares]: I don't understand.

[Prosecutor]: So you stated earlier on your . . . direct examination that some people in the state hospital told you you were fine and that you have everything "in general" implying good things about your character but that's not actually the full story of what happened, was it?

THE COURT: Hold on.

[Defense Counsel]: Again, Your Honor, we have two questions.

THE COURT: Okay.

[Defense Counsel]: Two questions before.

THE COURT: Let me have you approach.

[Defense Counsel]: This is confusing.

THE COURT: Approach. All right. Can you hear?

[Court Reporter]: Yes.

THE COURT: Okay. This issue of competency I think it's going to be a real problem if it continues.

[Prosecutor]: Judge, I'm concerned too but he testified about the fact that multiple people in the state system told him he was fine. The defense attorney asked him a whole line of questions about it and I feel like it's one of his.

THE COURT: Okay. Then probably suggest you try [to] break up the questions and be really elementary and

21

|  |  |
|---|---|
| | one at a time because you are compounding quite a few questions. |
| [Prosecutor]: | I understand but he's purposely not understanding my questions. |
| [Defense Counsel]: | The way I understand it, that's not the issue— |
| [Prosecutor]: | So if I'm going to ask him questions about previous statements— |
| THE COURT: | Let him finish, [Prosecutor]. Go ahead. |
| [Defense Counsel]: | He barely reads and he has obviously some issues, okay. And you're just trying to confuse him more and get him to react. That's the way I see it and that's a lot to do—it seems to suggest that taking advantage of the fact that he may not be competent and you opening a big door. |
| [Prosecutor]: | You opened the door. You asked multiple questions about it. |
| [Defense Counsel]: | I did not go into competency. I went into all that have to do be [sic] the trial, nothing else. |
| [Prosecutor]: | That's not how he answered the questions, unfortunately. |
| THE COURT: | Just try [to] make the question simple. |

After the bench conference ended, Casares resumed testifying. Ultimately, the jury found Casares guilty on both counts of indecency with a child by sexual contact.

During the punishment phase, Casares pleaded true to the State's enhancement paragraphs alleging that he had previously been convicted of two felony offenses. After the parties presented closing arguments, the jury sentenced Casares to forty years' imprisonment on each count. The trial court ordered that the sentences run consecutively. This appeal followed.

## II. COMPETENCY

In his first issue, Casares argues that there was "overwhelming evidence that [his] mental status had deteriorated since his last competency evaluation" such that the trial court abused its discretion by failing to inquire, sua sponte, as to his competency to stand trial.

### A. Standard of Review and Applicable Law

We review a trial court's decision not to conduct an informal competency inquiry into a criminal defendant's competency to stand trial for an abuse of discretion. *Montoya v. State*, 291 S.W.3d 420, 426 (Tex. Crim. App. 2009), *superseded by statute on other grounds as recognized in Turner v. State*, 422 S.W.3d 676, 692 & n.31 (Tex. Crim. App. 2013); *Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim. App. 1999). A trial court does not abuse its discretion absent a showing that its decision was arbitrary or unreasonable. *Montoya*, 291 S.W.3d at 426; *Moore*, 999 S.W.2d at 393. In conducting our review, we do not substitute our judgment for that of the trial court, but rather determine whether the trial court's decision was arbitrary or unreasonable. *Montoya*, 291 S.W.3d at 426. We give "great deference" to the trial court's assessment of a defendant's ability to rationally and factually understand the proceedings and to assist counsel. *See Lewis v. State*, 532 S.W.3d 423, 432 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (citing *McDaniel v. State*, 98 S.W.3d 704, 713 (Tex. Crim. App. 2003)).

A fundamental principle of our criminal justice system is that, as a matter of constitutional due process, a criminal defendant who is incompetent may not stand trial. *Boyett v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018); *Owens v. State*, 473 S.W.3d

23

812, 816 (Tex. Crim. App. 2015); *Turner*, 422 S.W.3d at 688; *see Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, *to consult with counsel, and to assist in preparing his defense* may not be subjected to a trial."). The constitutional standard for competency to stand trial is codified in Article 46B of the Texas Code of Criminal Procedure, which describes the circumstances that require, and the procedures for making, a determination of whether a defendant is competent to stand trial. *See* TEX. CODE CRIM. PROC. ANN. arts. 46B.001–.055.

"Substantively, incompetency to stand trial is shown if the defendant does not have: '(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person.'" *Boyett*, 545 S.W.3d at 563 (quoting TEX. CODE CRIM. PROC. ANN. art. 46B.003(a)); *Turner*, 422 S.W.3d at 689. "Procedurally, a trial court employs two steps for making competency determinations before it may ultimately conclude that a defendant is incompetent to stand trial[:] [t]he first step is an informal inquiry; the second step is a formal competency trial." *Boyett*, 545 S.W.3d at 563. "At the informal inquiry, there must be 'some evidence from any source that would support a finding that the defendant may be incompetent to stand trial.'" *Id.* (quoting TEX. CODE CRIM. PROC. ANN. art. 46B.004(c)). "If that requirement is met, then the trial court must order a psychiatric or psychological competency examination, and except for certain exceptions, it must hold a formal competency trial." *Id.* (citing TEX. CODE CRIM. PROC. ANN.

24

arts. 46B.005(a), (b), 46B.021(b)); *Turner*, 422 S.W.3d at 693. Article 46B.004 describes

how the informal inquiry can be triggered:

> (a)    Either party may suggest by motion, or the trial court may suggest on its own motion, that the defendant may be incompetent to stand trial. A motion suggesting that the defendant may be incompetent to stand trial may be supported by affidavits setting out the facts on which the suggestion is made.

> (b)    If evidence suggesting the defendant may be incompetent to stand trial comes to the attention of the court, the court on its own motion shall suggest that the defendant may be incompetent to stand trial.

> (c)    On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial.

> (c-1)   A suggestion of incompetency is the threshold requirement for an informal inquiry under Subsection (c) and may consist solely of a representation from any credible source that the defendant may be incompetent. A further evidentiary showing is not required to initiate the inquiry, and the court is not required to have a bona fide doubt about the competency of the defendant. Evidence suggesting the need for an informal inquiry may be based on observations made in relation to one or more of the factors described by Article 46B.024 or on any other indication that the defendant is incompetent within the meaning of Article 46B.003.

TEX. CODE CRIM. PROC. ANN. art. 46B.004. Article 46B.024 lists several factors which must

be considered in a competency evaluation, including a defendant's capacity during trial

court proceedings to: (1) rationally understand the charges against him and the potential

consequences of the proceedings; (2) disclose to counsel pertinent facts, events, and

states of mind; (3) engage in a reasoned choice of legal strategies and options;

(4) understand the adversarial nature of the trial court proceedings; (5) exhibit appropriate

courtroom behavior; and (6) testify. *Id.* art. 46B.024(1). Additional factors include

information regarding whether the defendant has a mental illness or intellectual disability;

25

whether the identified condition has lasted or is expected to "last continuously for at least one year"; whether medication is necessary to maintain the defendant's competency; and the degree of impairment resulting from any mental illness or intellectual disability and "the specific impact on the defendant's capacity to engage with his counsel in a reasonable and rational manner." *Id.* art. 46B.024(2)–(5).

Here, multiple competency evaluations were performed prior to trial, and the final evaluation resulted in a finding of competence by Talbot, which the trial court accepted. If a formal competency proceeding results in a finding of competency, "the trial court is not obliged to revisit the issue later absent a material change of circumstances suggesting that the defendant's mental status has deteriorated." *Turner*, 422 S.W.3d at 693 (noting that, "especially when there has been a suggestion of incompetency but no formal adjudication of the issue, due process requires the trial court to remain ever vigilant for changes in circumstances that would make a formal adjudication appropriate"); *Learning v. State*, 227 S.W.3d 245, 250 (Tex. App.—San Antonio 2007, no pet.) ("To justify a second competency hearing, defense counsel would have had to offer new evidence of a change in [appellant]'s mental condition since the first competency hearing.").

**B.    Discussion**

Casares points out several statements from the record by which he claims "trigger[ed] the trial court's statutory duty to make [an informal] inquiry." We address each in turn.

Casares first points to his interruptions during jury selection, which led to his removal from the courtroom. One factor under Article 46.024 is a defendant's capacity to

display appropriate courtroom behavior. *See id*. art. 46B.024(1)(E). However, disruptive courtroom behavior and a general failure to cooperate are not always probative evidence of incompetence to stand trial. *See George v. State*, 446 S.W.3d 490, 501 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (citing *Burks v. State*, 792 S.W.2d 835, 840 (Tex. App.—Houston [1st Dist.] 1990, pet. ref'd)). "If such actions were probative of incompetence, one could effectively avoid criminal justice through immature behavior." *Id.* (quoting *Burks*, 792 S.W.2d at 840). We note that Casares's disruptions were limited to jury selection; he did not disrupt proceedings at any other point during trial. In addition, Casares argues that his own "long, discursive non-responsive answers to the [trial] court's questions as to whether he could behave" was evidence of incompetency. While some of Casares's answers to the trial court's inquiries were rambling and nonresponsive, the trial court was within its discretion to determine that they were not the type of disruptive behavior that might suggest incompetence. *See Lindsey v. State*, 544 S.W.3d 14, 24 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) ("Appellant's behavior, while imperfect and rude, at times, did not suggest incompetency.") (citing *George*, 446 S.W.3d at 501).

Importantly, the trial court was in the best position to evaluate the significance of Casares's responses and whether they indicated he was incompetent to stand trial. *See Montoya*, 291 S.W.3d at 426 ("[T]hose who observed the behavior of the defendant at the hearing were in a better position to determine whether she was presently competent."); *see also Ramos v. State*, No. 13-22-00293-CR, 2023 WL 8850088, at *11 (Tex. App.—Corpus Christi–Edinburg Dec. 21, 2023, no pet.) (mem. op., not designated for publication) (concluding that, although appellant made "demonstrably false or non-

27

sensical statements to the trial court" and "appeared confused about his application for probation and his not guilty plea," the trial court could have rationally determined appellant's statements were "made purposefully in order to obstruct the trial" and no second competency evaluation was required); *Duong v. State*, No. 02-18-00128-CR, 2019 WL 3334426, at *7 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op., not designated for publication) (finding that the trial court could have reasonably concluded that it was facing a disruptive but competent defendant intent on stopping the trial and therefore the trial court did not abuse its discretion by failing to conduct a competency hearing).

Casares also argues that his repeated references to double jeopardy "evok[ed] his insistence to Dr. Augustus that the criminal charges against him had been dismissed." The record shows that Casares's references to double jeopardy during jury selection included no explicit or implicit assertions that his criminal charges were dismissed, and it appears that Casares was merely trying to convey what he was told by his former defense counsel. Under these circumstances, we disagree that these references suggest that he lacked a rational understanding of his charges and potential consequences. *See* TEX. CODE CRIM. PROC. ANN. arts. 46B.003(a), .024(1)(A).

Additionally, Casares asserts that his statements "that Mr. Ramon was not his attorney [and] that his attorney was the discharged lawyer Mr. Harper" evidenced his confusion about the identity of his defense counsel and "should have alerted the [trial] court that [he] was unable to cooperate with his attorney on his defense." Regarding this purported confusion, we note that when Casares stated his attorney was Harper, he also

28

stated, "Call in Austin. They told me your lawyer is Harper. Don't be lying, they told me."

Casares did not fully explain who told him Harper was his defense counsel, but given this

context, the trial court was within its discretion to conclude the statements were not so

bizarre or unusual as to indicate an inability to assist his counsel or a material change of

circumstances since Talbot's evaluation.[4] *See Lindsey*, 544 S.W.3d at 24; *Turner*, 422

S.W.3d at 693; *see also* TEX. CODE CRIM. PROC. ANN. art. 46B.024(1)(B).

Casares next contends that his statements that he had been "set up" by Yvette

and Moreno further indicated his incompetence. The record indicates that Casares

continuously asserted his belief he was "set up" during his post-arrest interview with law

enforcement and his various competency evaluations. However, Wright noted during the

first competency evaluation that Casares's "suspicions were possible in real life and did

not constitute bizarre delusions." Similarly, Talbot noted during Casares's last

competency evaluation that he "demonstrates conspiratorial beliefs and delusional

thinking, though none are bizarre or outside the realm of something that could be true."

For the same reasons, the trial court did not abuse its discretion in determining that the

statements were not probative of incompetency or a change in circumstances. *See*

*Lindsey*, 544 S.W.3d at 24; *Turner*, 422 S.W.3d at 693.

Casares also contends that the trial court was "placed on notice by both Dr.

Augustus and Dr. Talbot that questions as to [his] competence could arise again,

particularly if he went a long time without medication." *See* TEX. CODE CRIM. PROC. ANN.

---

[4] The record indicates that Casares was generally uncooperative with both of his court-appointed attorneys throughout the pendency of the case, including when mental health professionals concluded that he was not competent, and later, when they found him competent.

art. 46B.024(2)–(5). The record indicates that Casares suffered from bipolar disorder and had been prescribed medication for it. *See id.* Specifically, Augustus diagnosed Casares with "Bipolar Disorder, Not Otherwise Specified," and she concluded in her report that he was then incompetent to stand trial "due to symptoms of mental illness" but that he was "restorable to trial competency in the foreseeable future." Talbot noted in the last competency evaluation that Casares "met the competency standard without medication, however, some people with mental illness may decompensate significantly after a longer period of time without medication" and that "[i]t is not clear whether medication is necessary for maintaining his competency, but it is recommended to provide benefits in mood stabilization and increasing rational thinking."

In connection to the possibility of regression of his competency due to lack of medication, Casares merely points to his "tangential" responses to the trial court's questions during jury selection, which we have already concluded above was not necessarily indicative of incompetency. Furthermore, there was no evidence shown at the time of trial that Casares was failing to take his bipolar medication currently prescribed to him. *See Lindsey*, 544 S.W.3d at 26. ("Although some evidence suggested that appellant had been diagnosed with bipolar disorder and, at one time, had been prescribed medication, . . . [n]o evidence showed appellant was failing to take medication currently prescribed.")

Casares further directs us to matters that occurred several months prior to his trial, including the joint motion to withdraw by his defense attorneys and the hearing that occurred regarding that motion. However, Casares does not connect said matters to

30

evidence of his incompetence that was observed by the trial court *at the time of trial*. The relevant time frame for determining a defendant's competency is at the time of the trial court proceedings. *Laflash v. State*, 614 S.W.3d 427, 432 (Tex. App.—Houston [1st Dist.] 2020, order). While Casares's defense counsel expressed to the trial court that the attorney-client relationship was "very weak if not non-existent" just prior to the prosecutor's opening statements, the trial court was within its discretion to conclude that this statement did not raise an inference that he was unable to assist his counsel. *See Turner*, 422 S.W.3d at 696 (explaining that trial court need not conduct competency inquiry when "there is some evidence that the defendant obstinately refuses to cooperate with counsel but nothing from which to rationally infer that his obstinacy is fueled by mental illness"); *see also DeWitt v. State*, Nos. 05-12-00583-00585-CR, 2013 WL 3389055, at *2 (Tex. App.—Dallas July 3, 2013, no pet.) (mem. op., not designated for publication) (noting that "a failure to consult with counsel does not demonstrate a lack of competence; instead, a defendant must be *unable* to consult with counsel").

Casares argues that the trial court was aware that his own statement that he had "gone to the state hospital and they evaluated him multiple times and found him 'fine[]'" was untrue. The record shows that mental health professionals twice concluded Casares was incompetent due to mental illness, and subsequently twice concluded that he was competent to stand trial. Whether Casares's statement is characterized as misleading, deceptive, or an outright falsity, the trial court was within its discretion to conclude it was not probative of present incompetency or a change in circumstances since Talbot's report. *See* TEX. CODE CRIM. PROC. ANN. arts. 46B.003, .024(1)–(5); *Turner*, 422 S.W.3d at 693.

31

Related to this issue are Casares's responses to the prosecutor's cross-examination questions regarding his court-ordered examinations. When the parties approached the bench after Casares objected to the compound form of the prosecutor's question, the trial court warned, "Okay. This issue of competency I think it's going to be a real problem if it continues." We do not interpret this statement to indicate that the trial court was itself suggesting that Casares was presently incompetent to stand trial. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.004(c-1). Rather, the context appears to be that the trial court was concerned regarding the subject matter of the prosecutor's questions.

Finally, Casares argues that his defense counsel suggested he "may not be competent" during this exchange at the bench. The record indicates that the quoted language at issue occurred during defense counsel's response to the prosecutor's assertion that Casares was "purposely not understanding" her questions. We note that defense counsel did not request the trial court to stay the proceedings to have Casares evaluated for competency to stand trial during this exchange, nor at any other point during the trial, nor was the issue of competency raised by post-judgment motion for new trial.[5] The Code of Criminal Procedure provides that "[a] suggestion of incompetency . . . may consist solely of a representation from any credible source that the defendant may be incompetent." TEX. CODE CRIM. PROC. ANN. art. 46B.004(c-1). To the extent that the quoted language can be considered a "suggestion of incompetency," we do not find that it constituted evidence of a present mental illness from a credible source due to the

---

[5] Neither party filed a motion suggesting that Casares was incompetent at the time of trial. *See* TEX. CODE CRIM. PROC. ANN. art. 46B.004(a).

32

surrounding circumstances by which it was uttered. *See id.* arts. 46B.004(c-1), 46B.024(2)(a), (3)–(5); *see also Lindsey*, 544 S.W.3d at 26 (holding that the appellant's brother's statement describing appellant as mentally disabled was not evidence of a present mental disability from a credible source). Moreover, the remark is not indicative of a material change in circumstances in Casares's mental condition since the final formal evaluation was concluded. *See Turner*, 422 S.W.3d at 693.

Accordingly, we hold that the trial court did not abuse its discretion in failing to conduct a sua sponte informal inquiry as to Casares's competency to stand trial. *See Montoya*, 291 S.W.3d at 426; *Moore*, 999 S.W.2d at 393. Casares's first issue is overruled.

### III.    MOTION TO WITHDRAW

In his second issue, Casares argues that the trial court abused its discretion in denying, in part, his defense attorneys' joint motion to withdraw.

### A.    Standard of Review and Applicable Law

"The Federal and Texas Constitutions, as well as Texas statute, guarantee a defendant in a criminal proceeding the right to have assistance of counsel." *Gonzalez v. State*, 117 S.W.3d 831, 836 (Tex. Crim. App. 2003); *see* U.S. CONST. amends. VI, XIV; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. ANN. art. 1.05. However, such right is not absolute. *Gonzalez*, 117 S.W.3d at 837. "Once the court has appointed an attorney to represent the indigent defendant, the defendant has been accorded the protections provided under the Sixth and Fourteenth Amendments and Article 26.04 of the Texas Code of Criminal Procedure, and the defendant then carries the burden of proving

33

entitlement to a change of counsel." *Barnett v. State*, 344 S.W.3d 6, 24 (Tex. App.—Texarkana 2011, pet. ref'd) (citing *Webb. v. State*, 533 S.W.2d 780, 784 (Tex. Crim. App. 1976)); *see also Longoria v. State*, No. 13-16-00680-CR, 2018 WL 3151473, at *2 (Tex. App.—Corpus Christi–Edinburg June 28, 2018, pet. ref'd) (mem. op., not designated for publication) ("[W]here the defendant is indigent and counsel has been appointed, there is no established right to pick and choose one's representation.").

Significantly, a trial court is under no duty to search for an attorney until it finds one agreeable to the defendant. *See Barnett*, 344 S.W.3d at 24. A defendant's right to counsel of choice "may be overridden by other important considerations relating to the integrity of the judicial process and the fair and orderly administration of justice." *Gonzalez*, 117 S.W.3d at 837; *see United States v. Gonzalez-Lopez*, 548 U.S. 140, 152 (2006) (noting the trial court's "wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar"). The decision to permit the withdrawal of court-appointed counsel and subsequently appoint substitute counsel rests within the sound discretion of the trial court. *See Coleman v. State*, 246 S.W.3d 76, 85 (Tex. Crim. App. 2008); *see also* TEX. CODE CRIM. PROC. ANN. art. 26.04(j)(2) ("An attorney appointed under this article shall . . . represent the defendant until charges are dismissed, the defendant is acquitted, appeals are exhausted, or the attorney is permitted or ordered by the court to withdraw as counsel for the defendant after a finding of good cause is entered on the record[.]"). The trial court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "We make this determination based upon

what was before the trial court when it made its decision." *See Williams v. State*, 154 S.W.3d 800, 802 (Tex. App.—Houston [1st Dist] 2004, pet. ref'd) (citing *Montgomery v. State*, 810 S.W.2d 372, 380, 391 (Tex. Crim. App.1990)).

## B.    Analysis

On March 30, 2023, Harper filed a motion to withdraw citing an inability to "effectively communicate" with Casares as good cause. The trial court did not grant Harper's motion. Instead, the trial court appointed Ramon as co-counsel on April 5, 2023. On May 24, 2023, Ramon and Harper filed a "Joint Defense Attorneys' Motion to Withdraw." In the motion, the attorneys averred that they had unsuccessfully attempted to confer with Casares; that Casares was "seriously and aggressively not wanting to be represented by [Harper]"; that the "same situation exists" as to Ramon but without the "animosity"; that Casares "had very harsh words for . . . Harper as well as the Court"; and that Casares "may not be mentally ill, but he is dangerous." In addition, the motion stated:

> There is no viable nor constitutionally sound attorney-client relationship and thus there can be no effective assistance of defense counsel guaranteed to [Casares]. This situation can only lead to trouble for both defense counsel of record. [Casares] indicated that he wants to represent himself and to do so before another District Judge. Not a good omen for his chances in a very serious case where absolute confidence and communication is necessary to mount a viable defense. As of now, [Ramon] has no idea nor indication of what that might be since [Casares] refused to confer with him and instead wanted me to convey messages as stated above to . . . Harper and the Court.
>
> Accordingly, Movants . . . Ramon and . . . Harper jointly move to withdraw in the best interest of justice and to find other defense counsel that might be able to communicate with the defendant.

At a hearing on June 30, 2023, Ramon asked the trial court to "put on the record" that Casares's charged offenses were second-degree felonies because Casares "h[ad] it

in his mind that he had a third-degree felony." Thereafter, the following exchange occurred:

| [Casares]: | Harper tells me it's two. |
|---|---|
| THE COURT: | Don't say anything. I'm not going to hear from you anymore. |
| [Casares]: | Okay. |

Subsequently, Ramon explained that the State offered Casares a plea bargain and that Ramon would need time to discuss it with Casares and his family. Ramon also indicated that Casares wanted a trial and had a "misconception of what's going on in federal court and I need time to investigate that and find out." The trial court then informed Casares of his charges and that they were second-degree felonies. The trial court next asked Ramon if he had any objection to allowing Harper to withdraw, and Ramon responded, "No objection." The trial court subsequently asked him if there was anything else and Ramon replied, "Not at this time." On the same day, the trial court signed its written order granting the joint motion to withdraw "[a]s to [a]ttorney Jad Harper only. Attorney Ramon will remain as Counsel of record for the Defendant."

On appeal, Casares complains that the trial court erred in failing to grant the joint motion to withdraw as to Ramon. Casares argues that the "grounds for the motion to withdraw pertained to a [non-]waivable right—effective assistance of counsel" and that "well-established law requires the court to have made some inquiry into the dissatisfaction of . . . Casares with his attorney before ruling upon a motion to withdraw premised upon conflict between attorney and client." As shown above, the "good cause" cited by the joint motion to withdraw was that Casares refused to communicate with both of his defense

36

attorneys. The motion asserted that animosity existed between Casares and Harper, but not between Casares and Ramon. At the June 30, 2023 hearing, Ramon did not elaborate on the joint motion and the trial court impliedly denied the motion as to Ramon without further inquiry or explanation. Thus, Casares's alleged refusal to communicate with Ramon was the only allegation supporting "good cause" as to Ramon that was before the trial court at the time it made its ruling.[6] *See Williams*, 154 S.W.3d at 802.

At most, Casares's refusal to communicate indicates a personality conflict, which does not necessitate appointment of new counsel. *See Hobbs v. State*, 359 S.W.3d 919, 927 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (concluding no abuse of discretion in denying two separately filed motions to withdraw prompted by appellant's filing of meritless grievances to the State Bar of Texas); *Maes v. State*, 275 S.W.3d 68, 71 (Tex. App.—San Antonio 2008, no pet.) (concluding same where appellant characterized his relationship with counsel as "irreparable, antagonistic"); *see also Grantham v. State*, No. 06-21-00150-CR, 2022 WL 4232914, at *1 (Tex. App.—Texarkana Sept. 14, 2022, no pet.) (mem. op., not designated for publication) (concluding same where appellant told the trial court he did "not like or trust [counsel] and did not feel that [counsel] would 'fight for [him] . . . at all'" and "accused [counsel] of threatening him, which prompted [counsel] to notify the trial judge, 'Almost everything [appellant]'s telling you is a lie'"); *Morris v.*

---

[6] In his brief, Casares references a handwritten letter to the trial court in which he alleged his attorneys were "unhelpful." Casares also requested to "fire" them and obtain new court-appointed counsel. This letter was file-stamped July 26, 2023, and is included in the appellate record. However, there is no indication that the trial court was aware of this document at the June 30, 2023 hearing. Therefore, we do not consider the letter in our analysis. *See Haas v. State*, 494 S.W.3d 819, 823 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("An appellate court must review the trial court's ruling in light of what was before the trial court at the time the ruling was made.").

*State*, No. 12-17-00124-CR, 2018 WL 6321081, at *3 (Tex. App.—Tyler Dec. 4, 2018, no pet.) (mem. op., not designated for publication) (concluding same where counsel filed two separate motions premised on appellant's recurring complaints that counsel was failing to communicate with him or spend time on his case); *Anderson v. State*, No. 02-17-00044-CR, 2018 WL 359635, at *7 (Tex. App.—Fort Worth Jan. 11, 2018, no pet.) (mem. op., not designated for publication) (concluding same where counsel notified the trial court that appellant had "told him that he should consider their relationship severed and asked him to file the motion to withdraw" and "did not 'seem to have any interest in any of the legal advice'" that counsel had to offer); *Johnson v. State*, 352 S.W.3d 224, 228 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (observing the prevalence of opinions examining a trial court's decision on an attorney's motion to withdraw based "on disagreements between counsel and client").

Under the facts of this case, we hold that the trial court did not abuse its discretion by denying the joint motion to withdraw as it applied to Ramon. *See Coleman*, 246 S.W.3d at 85; *Rhomer*, 569 S.W.3d at 669. Casares's second issue is overruled.

## IV.    INEFFECTIVE ASSISTANCE OF COUNSEL

In his third issue, Casares argues that he suffered from ineffective assistance of counsel.

## A.    Standard of Review and Applicable Law

To reverse a conviction based on ineffective assistance of counsel, we must find: (1) counsel's representation fell below an objective standard of reasonableness, and (2) the defendant was prejudiced. *Andrus v. Texas*, 590 U.S. 806, 813 (2020) (citing

38

*Strickland v. Washington*, 466 U.S. 668, 688–94 (1984)); *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023). Any claim for ineffectiveness of counsel "must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Prine v. State*, 537 S.W.3d 113, 117 (Tex. Crim. App. 2017) (citations omitted); *see Hart*, 667 S.W.3d at 781.

The appellant bears the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Perez v. State*, 689 S.W.3d 369, 381 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.) (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). We employ a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance and that it was motivated by a sound trial strategy. *Strickland*, 466 U.S. at 689; *Hart*, 667 S.W.3d at 781. We consider "the reasonableness of counsel's actions at the time, rather than viewing such actions through the benefit of hindsight." *Hart*, 667 S.W.3d at 782.

To establish prejudice under the second prong, appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). Accordingly, failure to make a showing under either *Strickland* prong defeats a claim for ineffective assistance. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) (citing *Thompson*, 9 S.W.3d at 813).

**B.     Analysis**

**1.      Failure to File Competency Motion**

Casares argues that Ramon was ineffective for failing to file a motion suggesting incompetency. *See* TEX. CODE CRIM. PROC. art. 46B.004(a). The record is silent as to the reasons why Ramon did not file a motion suggesting incompetency. *See Thompson*, 9 S.W.3d at 813–14. However, we have thoroughly analyzed the competency issue above and concluded that the trial court did not abuse its discretion in determining there was no evidence suggesting that Casares was incompetent during his trial. Thus, Casares has not overcome the strong presumption that Ramon's conduct was "within the wide range of reasonable professional assistance." *See Strickland*, 466 U.S. at 689; *Ex parte LaHood*, 401 S.W.3d 45, 57 (Tex. Crim. App. 2013) (noting that, to prevail in a claim of ineffective assistance of counsel based on the failure of counsel to seek a full competency evaluation, "there must be some affirmative showing that the [defendant] lacked 'sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against the person'"); *Thompson*, 9 S.W.3d at 813.

**2.      Waiver of Statutory Right to Be Present During Voir Dire[7]**

Casares next argues that Ramon was ineffective for waiving Casares's statutory right to remain in the courtroom during voir dire. "Texas law provides that the right to be present during voir dire . . . cannot be waived." *Smith v. State*, 534 S.W.3d 87, 91 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd) (cleaned up); *see also* U.S. CONST.

---

[7] Casares does not raise a claim that his constitutional rights were violated.

amend. VI; TEX. CONST. art. I, §§ 10, 19; *Lira v. State*, 666 S.W.3d 498, 511 (Tex. Crim. App. 2023) ("[T]he right to be present in the courtroom at every stage of trial is guaranteed by the Confrontation Clause of the Sixth Amendment."); TEX. CODE CRIM. PROC. ANN. art. 33.03 ("In all prosecutions for felonies, the defendant must be personally present at the trial"). Until the jury is seated, a defendant has an absolute right to be present during the voir dire. *See Smith*, 534 S.W.3d at 91; *see also Ashley v. State*, 404 S.W.3d 672, 681 (Tex. App.—El Paso 2013, no pet.) (holding that it violated article 33.03 when the trial court conducted voir dire proceedings without the defendant even though the defendant had voluntarily absented himself from the proceedings).

After the trial court removed Casares for interrupting the proceedings during jury selection, the trial court asked Ramon if he agreed with Casares's removal, and Ramon responded that he agreed and that it was in the "best interest of [Casares] that he be allowed to participate through [Z]oom. If this were to happen in front of the jury, it would be certainly not to his advantage at all." However, Ramon was not at liberty to waive Casares's presence at voir dire. *See* TEX. CODE CRIM. PROC. ANN. art. 33.03; *Smith*, 534 S.W.3d at 91. We assume without deciding that Ramon's action in waiving Casares's right to be present during voir dire was deficient and analyze whether Casares suffered the requisite level of prejudice as a result. *See Thompson*, 9 S.W.3d at 812.

In order to determine whether the result of this proceeding would have been different but for Ramon's actions, it is prudent to first determine whether the trial court's decision to exclude Casares from the courtroom for voir dire was harmless error. When a trial court commits statutory error, an appellate court may not reverse unless it

41

determines that the error affected a substantial right. TEX. R. APP. P. 44.2(b). "A substantial right is affected when the error (1) had a substantial and injurious effect or influence in determining the jury's verdict or (2) leaves one in grave doubt whether it had such an effect." *Ashley*, 404 S.W.3d at 681 (cleaned up). "A substantial right is not affected and the error is harmless if, after reviewing the entire record, the appellate court determines the error did not influence, or had only a slight influence, on the trial's outcome." *Id.*

The court of criminal appeals has held no violation of substantial rights occurs during voir dire unless the record shows the defendant was actually denied a fair and impartial jury. *See Ladd v. State,* 3 S.W.3d 547, 562 (Tex. Crim. App. 1999). Nothing in the record before us shows that the jury selected in Casares's absence was unfair or impartial. *See Gray v. State,* 233 S.W.3d 295, 298–99 (Tex. Crim. App. 2007) (concluding that appellant's only substantial right is that jurors who serve be qualified); *Ladd*, 3 S.W.3d at 562 (holding no violation of substantial rights occurred during voir dire where record did not show that defendant was denied fair and impartial trial). Accordingly, we cannot conclude that Ramon's waiver of Casares's right to be present during voir dire, even if improper, had a prejudicial effect on the outcome of Casares's trial. *See Andrus*, 590 U.S. at 813–14; *Strickland*, 466 U.S. at 694. In other words, Casares has not shown that the result of his proceeding would have been different but for the alleged deficiency. *See Thompson*, 9 S.W.3d at 812.

### 3. "Disparaging Comment"

Casares argues that Ramon's "disparaging comment about [Casares] being 'uncooperative' was unnecessary and disloyal to [Casares]." Casares provides no authority supporting the assertion that such comments constitute deficient performance. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). Furthermore, the record indicates that the complained-of comment was uttered to the trial court outside the presence of the venire panel, after Casares was removed from the courtroom for his disruptive behavior. Because the comment was not heard by any individuals that may have comprised the jury, Casares has not shown he suffered any prejudice from the alleged deficiency. *See Thompson*, 9 S.W.3d at 812.

### 4. Disclosure of Plea Agreement

Casares contends that Ramon's "public disclosure of the specific terms of the plea offer that [Casares] rejected also showed disloyalty and violated his client's right to confidential communications with counsel" and did not advance his interest. In support of his argument, Casares cites a singular concurring-and-dissenting opinion without elaboration. *See Monreal v. State*, 947 S.W.2d 559, 567 n.3 (Tex. Crim. App. 1997) (Bard, J., concurring and dissenting).

In *Monreal*, defense counsel questioned the appellant regarding plea negotiations before the judge during the punishment phase of the appellant's bench trial. *Id.* at 561–62. On petition for discretionary review, the Texas Court of Criminal Appeals affirmed the Fourth Court of Appeals's holding that the appellant did not demonstrate that counsel

rendered ineffective assistance due to a conflict of interest.[8] *See id.* at 560–565. Unlike the facts in *Monreal*, the disclosure of the terms of the plea agreement in this case were not presented to the jury. Instead, the information was presented to the trial court outside the presence of the jury. Therefore, *Monreal* is not applicable to the instant case. Casares presents no further argument. *See* TEX. R. APP. P. 38.1(i). We conclude Casares has not shown his counsel was ineffective for disclosing the terms of the plea agreement to the trial court. *See Thompson*, 9 S.W.3d at 812.

### 5. "Non-Existent" Counsel

Casares contends that his attorney-client relationship with Ramon "never existed," citing the previously discussed joint motion to withdraw and Casares's subsequent letter by which he claimed both his attorneys were "unhelpful" and requested new court-appointed counsel.

In particular, Casares claims Ramon was ineffective for failing to "urge" the joint motion to withdraw as it pertained to Ramon, which we construe as an argument that Ramon failed to object to the trial court's ruling on the motion. To establish ineffective assistance of counsel based on a failure to object, Casares "must demonstrate that the trial court would have committed harmful error in overruling the objection if trial counsel

---

[8] The majority held there was no actual conflict of interest created when defense counsel questioned the appellant regarding plea negotiations. *See Monreal v. State*, 947 S.W.2d 559, 565 (Tex. Crim. App. 1997). Furthermore, the majority held that the Fourth Court of Appeals applied the correct legal standard and considered relevant factors in holding that the appellant had not demonstrated his defense counsel was deficient under the first prong of the Strickland test. *See id.* at 562–65. In contrast, J. Bard opined that "[t]he first prong of *Strickland* was met when trial counsel demonstrated an actual conflict of interest by abandoning the interests of her client to protect herself against some future action by [the] appellant." *Id.* at 567 (Bard, J. concurring and dissenting). "The effect of the conflict was to place before the fact finder evidence which is inadmissible under TEX. R. EVID. 410." *Id.* However, J. Bard opined that the appellant had not proven the second prong of *Strickland*. *See id.* at 567–68.

44

had objected." *Alexander v. State*, 282 S.W.3d 701, 705 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). However, as discussed above, Casares's refusal to communicate with Ramon indicated nothing more than a personality conflict that did not necessitate appointment of new counsel, and the trial court did not abuse its discretion in denying the joint motion to withdraw as it pertained to Ramon. Ramon was under no obligation to make a further objection to an adverse ruling on a motion which was duly filed and presented to the trial court. *See Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991) ("Counsel is not required to engage in the filing of futile motions."). Thus, we reject this argument. *See Alexander*, 282 S.W.3d at 705.

Casares points to Ramon's statements to the trial court, outside the presence of the jury, that Ramon had not had "a single conference" with Casares after taking over the case, that Ramon was not aware what Harper had discussed with Casares, and that Ramon had not discussed the extraneous offense testimony of Paula with Casares.[9] However, these statements were made in connection with Ramon's objection to admission of Paula's extraneous offense testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.37. Ramon requested that Paula testify regarding the extraneous offense in a pretrial hearing to "give [Casares] an idea of what's going on." The record establishes that Paula testified about the extraneous offenses at a hearing outside the presence of the jury, with Casares present. Casares does not explain how his proceeding would have been different

---

[9] We are mindful that the record establishes that Casares refused to communicate, assist, or cooperate with both of his court-appointed attorneys throughout the pendency of his case.

had he and Ramon discussed Paula's extraneous offense testimony, or the State's evidence in general, prior to trial. *See Thompson*, 9 S.W.3d at 813–14.

Casares generally cites Ramon's statements to the trial court during various pre-trial hearings and the trial itself to exemplify the continuous conflict between them. While Ramon indicated to the trial court that "the attorney-client relationship here is very weak if not non-existent," the record does not support a conclusion that he provided ineffective assistance. The record demonstrates that Ramon engaged in vigorous cross-examination of the State's witnesses, lodged several objections to the admission of various evidence offered by the State, and presented witnesses on behalf of Casares's defense. The record also establishes that Ramon attended various pretrial hearings, including one where Casares voluntarily absented himself by refusing to leave his cell. The totality of the representation demonstrates that Ramon did not provide ineffective assistance. *See Thompson*, 9 S.W.3d at 813. Accordingly, Casares's third issue is overruled.

## V. CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
22nd day of May, 2025.